Julius **WEBB,** Ernest Thomas, Daniel Curbison, Roger Moore, Lea Sargent, Mark Washington, Mary Tucker, Anthony Green, George Harvin, Dorothy I. Davis, Lynwood Snowden, Robert H. McClammy, Bobby C. Hill, Emea Uma, Benjamin Braxton, Stacy S. Burtin, Arthur Matthews, Shannon Fiddiman–Simon, Delores J. Monroe–Morgan and Rudolph Warren, individually and on behalf of all others similarly situated,

v.

**MERCK & CO., INC.**

No. 99CV413.

United States District Court, E.D. Pennsylvania.

April 1, 2002.

Isaac H. Green, Jr., Philadelphia, PA, Adrian J. Moody, Moody and Anderson, P.C., Philadelphia, PA, Joseph C. Kohn, Martin J. D'urso, Kohn, Swift & Graf, P.C., Philadelphia, PA, Robert T. Vance, Jr., Philadelphia, PA, Hilary Cohen, Kohn Swift & Graf, PC, Philadelphia, PA, for plaintiffs.

Judith E. Harris, Michael J. Ossip, Morgan, Lewis & Bockius LLP, Philadelphia, PA, Gregory T. Mayes, Morgan, Lewis & Bockius, LLP, Philadelphia, PA, for defendant.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

The twenty named plaintiffs brought this employment discrimination action alleging that defendant engaged in intentional ("disparate treatment") discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, Title VI of the Civil Rights Act of

1964, as amended, 42 U.S.C. § 2000d and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Plaintiffs also allege "disparate impact" discrimination by defendant under Title VI and Title VII. Plaintiffs seek to have this court certify a class to adjudicate "compensation disparity" claims made by or on behalf of the following class members:

> All black employees who work (or former employees who have worked since January 1, 1989) for Merck & Co., (a) in the Merck Manufacturing Division ("MMD") at a plant in Pennsylvania, New Jersey or Georgia, or (b) as a Merck sales representative in the Mid–Atlantic Regional Business Group ("MARBG") of Merck's United States Human Health Division. ("USHH").

Although plaintiffs do seek compensatory and punitive damages, they currently seek class certification only as to liability issues as well as their damage claims seeking equitable relief regarding compensation issues. The compensation issues about which plaintiffs seek class certification "include those relating to initial assignments, performance reviews, job postings, promotions, and overall compensation (e.g., base pay as well as bonuses, stock options and/or overtime pay)" Plaintiffs Memorandum in Support of Class Certification at p. 2, n. 2.

A breakdown of the proposed class reveals the enormity of its scope. It includes *all* black employees at every level and every grade at six separate facilities (MMD's West Point, Pennsylvania, Rahway, New Jersey, Albany Georgia, Somerset, New Jersey and Danville, Pennsylvania locations and USHH's MARBG in Virginia) in five states, in two divisions, including union and non-union employees and their supervisors, managers and non-managers, sales representatives and secretaries and their supervisors and any other employee from vice-president to janitor. Indeed, plaintiffs estimate that the number of potential class members could well exceed 5000. Amended Complaint at paragraph 30. Named plaintiffs Curbison, Davis, Green, Harvin, Moore, Sargent, Tucker, Washington, Hill, McClammy and Matthews are or were unionized employees at Merck's West

Point, Rahway and Flint River facilities. *See* Am.Comp. at paragraphs 39(d), 40(b), 44(a), 45(b), 51(b). The record further reveals that there were 2,045 unionized employees at West Point and a total of 880 unionized employees at Rahway and Flint River as of December 31, 1999.

The discriminatory practices plaintiffs complain of are contained in paragraphs 25–28 of the Amended Complaint as follows:

> "25. Plaintiffs and the class members have been subjected to a continuous and pervasive pattern and practice of racial discrimination by Merck, in that Merck's supervisors, managers and officers have created, perpetuated and/or condoned a work environment that is hostile to Black employees, including the plaintiffs, and conducive to racial discrimination and harassment. For example, White supervisors and managers, and White employees with the knowledge of management, have made racially derogatory, demeaning and discriminatory statements to plaintiffs and other class members, and have taken other actions with respect to plaintiffs and the class members that were motivated by or in furtherance of racial discrimination or harassment.
>
> 26. Merck has promulgated equal employment opportunity and anti-discrimination policies and procedures that are supposed to apply to all employees and all divisions. However, Merck has granted to its managers, broad discretion in the implementation of those policies and procedures and has not established any meaningful policies, procedures, practices or controls to ensure that the equal employment opportunity and anti-discrimination objectives of those policies and procedures are achieved. Moreover, Merck has provided little or no guidance to its managers to assist them in exercising their discretion. As a result, those policies and procedures are applied in an inherently subjective manner and are neither effective nor adequate in remedying the racial discrimination and harassment present throughout Merck and about which plaintiffs and the class members complain. Merck's failure to enforce its own policies and to follow its

own procedures fosters and promotes racial harassment and racially discriminatory employment decisions.

27. Merck has followed a general practice of discriminating against Blacks with regard to discretionary employment decisions in the areas of hiring, compensation, promotion, demotion, job assignments, training, transfer, layoff discharge and discipline. Merck has also followed a general practice of racial harassment, intimidation and retaliation. This general practice exists throughout Merck and is followed by its management at all levels, who are accorded the broad discretion described therein. For example, Blacks, including the plaintiffs, are expressly and impliedly discouraged from seeking higher paying positions or higher responsibility positions, are maintained in lower paying subordinate positions, and are denied training and opportunities to demonstrate the qualifications necessary to obtain higher paying jobs or higher responsibility positions, and the opportunity to apply for those jobs or positions. The result has been a significantly segregated workforce throughout Merck.

28. The discriminatory practices of Merck have affected the plaintiffs and the class members whom they seek to represent in the following ways, among others:

A. Merck has failed and refused to recruit, hire and retain Blacks for positions at all levels of employment on an equal basis with Whites because of their race, thereby discriminating against those Blacks who were not hired and Blacks who were employed but were deprived of their right to work in a nonsegregated company.

B. Merck has failed and refused to compensate Black employees on an equal basis with White employees.

C. Merck has restricted or excluded Blacks from positions or assignments because of their race and generally has assigned blacks to positions or assignments of lower pay, lower responsibility or fewer opportunities for advancement and recognition than positions to which similarly or lesser qualified Whites were assigned.

D. Merck has kept and keeps Blacks in lower paying jobs by preventing or discouraging them from seeking training or skills qualification needed to obtain higher responsibility work, and generally has not promoted or permitted Blacks to transfer or to otherwise obtain higher responsibility work.

E. Merck has failed to provide Blacks with training and skills qualification opportunities in the same manner or to the same extent as those provided to Whites.

F. Merck has terminated Blacks because of their race and because they opposed or resisted discriminatory practices or harassment. Others, still working at Merck, who have opposed these discriminatory practices or harassment, have been exposed to escalating criticism of their job performance or have in other ways been subject to retaliation.

G. Merck's policies, procedures and practices have produced an adverse impact against Black employees with respect to hiring, compensation, promotion, demotion, job assignments, training, transfer, layoff, discharge and discipline."

Amended Complaint at paragraphs 25–28.

We will first evaluate whether the proposed class can be certified based on plaintiffs' disparate treatment theory. In making this determination, it is useful to set forth the burdens of proof in a disparate treatment case. To succeed on a disparate treatment claim, plaintiffs must establish that intentional discrimination was the defendant's "standard operating procedure." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). A disparate treatment class action is generally divided into two phases: liability and remedial. *Id* at 360–362, 97 S.Ct. 1843. At the liability stage, the plaintiffs must produce sufficient evidence to establish a prima facie case of a policy, pattern, or practice of intentional discrimination against the protected group. *Id.* at 360, 97 S.Ct. 1843. " 'Plaintiffs have typically depended upon

two kinds of circumstantial evidence to establish the existence of a policy, pattern or practice of intentional discrimination: (1) statistical evidence aimed at establishing the defendant's past treatment of the protected group, and (2) testimony from protected class members detailing specific instances of discrimination.'" *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir.2001) quoting 1 Arthur Larson et. al., *Employment Discrimination* § 9;03[1], at 9–18 (2d ed.2001).

If the plaintiffs satisfy this prima facie requirement, "[t]he burden [of production] then shifts to the employer to defeat [it] .... by demonstrating that the [plaintiffs'] proof is either inaccurate or insignificant." *Teamsters*, 431 U.S. at 360, 97 S.Ct. 1843.

"Once the defendant introduces evidence satisfying his burden of production, the trier of fact then must consider the evidence introduced by both sides to determine whether the plaintiffs have established by a preponderance of the evidence that the defendant engaged in a pattern or practice of intentional discrimination." *Robinson*, 267 F.3d at 159, citing *Teamsters*, 431 U.S. at 336, 97 S.Ct. 1843. If the plaintiffs are successful in proving a pattern or practice of discrimination, the court may proceed to fashion class-wide injunctive relief. *Teamsters* at 361, 97 S.Ct. 1843.

If individual relief such as back pay, front pay or compensatory recovery is sought in addition to class-wide injunctive relief, the court must conduct the "remedial" phase. *Id.* at 362, 97 S.Ct. 1843. At the remedial stage, the class member need only show that he or she suffered an adverse employment decision "and therefore was a potential victim of the proved [class-wide] discrimination." *Id.* The burden of persuasion then shifts to "the employer to demonstrate that the individual [was subjected to the adverse employment decision] for lawful reasons." *Id.*

■ The Supreme Court has concluded that class actions serve three principal functions: (1) facilitating judicial economy by the avoidance of multiple suits on the same subject matter; (2) providing a feasible means for asserting the rights of those who "would have no realistic day in court if a class action

were not available;" and (3) deterring inconsistent results and assuring a uniform, singular determination of rights and liabilities. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

To obtain class certification, plaintiffs must establish all four elements of Rule 23(a) of the Federal Rules of Civil Procedure along with one provision of Rule 23(b). *Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 183 (3d Cir.2001). Rule 23(a) requires a showing of: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed.R.Civ.P. 23(a); *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). If these requirements are satisfied, the court must also find that the class action is maintainable under Rule 23(b)(1), (2) or (3). *See* Fed.R.Civ.P. 23(b). Here, the plaintiffs seek certification pursuant to Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Id.*

The burden is on plaintiffs, as class representatives, to prove that all four prerequisites of Rule 23(a) are met. *Stadler v. McCullouch*, 949 F.Supp. 311, 314 (E.D.Pa. 1996). Failure to establish any one of the four elements will completely defeat a motion for class certification. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 259 F.3d 154, 181 (3d Cir.2001)

"In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can properly be resolved as a class action." *Id.* at 168 (3d Cir.2001).

■ Defendants do not dispute that plaintiffs have satisfied the numerosity requirement for purposes of the motion for class certification. It is the commonality and typicality elements which defendants challenge.

"The concepts of commonality and typicality are broadly defined and tend to merge." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d

Cir.1994). (citation omitted). Therefore, we will discuss both commonality and typicality together.

Commonality does not require an identity of claims or facts among class members; instead, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class," *In re the Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 310 (3d Cir.1998). However, "if broad discrimination is the only common denominator in the class, this does not satisfy the commonality requirement." *Zachery v. Texaco Exploration and Production, Inc.*, 185 F.R.D. 230, 238 (W.D.Tex. 1999). Because disparate treatment claims are by their very nature individual, the class treatment of these claims requires close scrutiny of the proposed class and their claims. *Id*, at 239. The "locus of decisionmaking authority is an important consideration when determining whether class certification is appropriate for systematic discrimination claims involving multiple facilities." *Faulk v. Home Oil Co.*, 184 F.R.D. 645, 655 (M.D.Ala. 1999).

In considering the typicality issue, we must determine whether "the named plaintiff[s] individual circumstances are markedly different or . . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985) (internal quotations omitted).

In the context of a Title VII class action, the Supreme Court has stated that an "across the board" class action [1] must be treated the same as any other class action and may be certified only if the trial court, after conducting a "rigorous analysis", finds that the prerequisites of Rule 23(a) have been satisfied. *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Although

the Supreme Court in *Falcon* stated that "racial discrimination is by definition class discrimination", the Court further stated that "the allegation that such discrimination occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that can be certified," *Id.* at 157, 102 S.Ct. 2364

According to the Supreme Court:

Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For respondent to bridge that gap, he must prove much more than the validity of his own claim. Even though evidence that he was passed over for promotion when several less deserving whites were advanced may support the conclusion that respondent was denied the promotion because of his national origin, such evidence would not necessarily justify the additional inferences (1) that this discriminatory treatment is typical of petitioner's promotion practices, [or] (2) that petitioner's promotion practices are motivated by a policy of ethnic discrimination that pervades petitioners' [ ] division. . . .

*Falcon*, 457 U.S. at 157–158, 102 S.Ct. 2364 (internal citations omitted). Class relief is most appropriate where the issues in the case turn on questions of law or fact "applicable *in the same manner* to each member of the class." *Id.* at 155, 102 S.Ct. 2364 (emphasis added).

In the case *sub judice*, the purported class is spread across five states (Pennsylvania, New Jersey, Georgia, Ohio and Virginia) and

---

**1.** Under the "across-the-board" doctrine, "any victim of racial discrimination in employment may maintain an 'across-the-board' attack on all unequal employment practices alleged to have been committed by the employer pursuant to a policy of racial discrimination." *Falcon*, 457 U.S. at 152, 102 S.Ct. 2364. Despite plaintiffs' protests that they are not seeking an "across-the-board" class action, the class plaintiffs propose cuts across employment status, job categories, facilities and geographic regions. The class claims, therefore, are by definition "across-the-board."

involves two different divisions (MMD and USHH) at six separate facilities (West Point, Rahway, Flint River, Somerset, Danville, MARBG). In addition, plaintiff's proposed class is comprised of employees in a multitude of occupations, including all hourly and salaried workers, union and non-union, management and non-management, professional and clerical in every operation unit in Merck's West Point, Rahway, Flint River, Somerset and Danville facilities. Even with respect to the 20 named plaintiffs, the Amended Complaint alleges that they worked in several different departments and facilities and were the victims of a myriad of ·discriminatory practices. Some received promotions while others were demoted. Some are management-level employees, and others are not; some complain of discharge while others are still working for defendant. For example, plaintiff Webb alleges that he was discriminated against in promotions to a Senior Supervisor position in the maintenance department at West Point, Pennsylvania. Am.Comp. at 29, 30. Plaintiff Hill alleges that he was discriminatorily demoted from a Utility Rover position in the utilities department at Flint River, Georgia. Am-Comp. at 51(a). Plaintiff Matthews alleges that he was discriminatorily denied a promotion to a supervisor position in the maintenance department at Rahway, New Jersey. AmComp. 2 at 55(a). Plaintiff Monroe–Morgan alleges that she was discriminatorily discharged from her administrative-assistant position at Somerset, New Jersey. Am-Comp. at 57(a). Plaintiff Burtin claims that he was discriminated against in compensation while in the MARBG Am.Comp. at 54(e). Plaintiff Sargent claims that she was discriminatorily denied employment as a service worker at West Point, Pennsylvania. Am. Comp. at 43(a). Plaintiff Harvin claims that he was discriminatorily disciplined while in the Varivax department at West Point, Pennsylvania—moreover, Mr. Harvin signed settlement agreement and general release waiving his rights to any claims under the civil rights laws AmComp. at 46(a) Plaintiff Moore claims that he was racially harassed while in the Sterile Operations department at West Point, Pennsylvania—moreover, Mr. Moore also signed a settlement agreement and general release waiving his right to bring claims under any civil rights laws. Am.Comp. at 40(b)

Thus, resolution of each of the named plaintiffs' claims will depend on their own discrete factual scenarios. For example, in analyzing only the claims of the named plaintiffs who claimed they were denied promotions, the fact finder will have to, *inter alia,* identify the positions at issue, determine whether the individual applied for and was denied the position, examine the necessary qualifications for the position, examine the individual's educational background, experience, work record, determine whether the other White candidates were qualified, determine whether the Black applicant was better qualified than the White recipient and examine Merck's reasons for not awarding the position to the Black applicant. Indeed, the record reveals that Merck has a number of different defenses that are unique to each named plaintiff. The fact finder will have to evaluate other criteria in analyzing the claims of the named plaintiffs who allege they were demoted, discharged and harassed. One can only imagine how these factual disparities will be exponentially increased by the addition of at least some 5000 plaintiffs. *See Riley v. Compucom Systems, Inc.,* 2000 WL 343189 at *2–3 (N.D.Tex. Mar.31, 2000) (denying class certification for lack of commonality and typicality where plaintiff's proposed class included employees who "worked in several different departments and on different 'teams,' " and employees who were both management level and non-management level). *Betts v. Sundstrand Corp.,* 1999 WL 436579, at *7 (N.D.Ill. 1999) ("[P]laintiffs' proposed class includes all job categories, union and non-union, clerical and professional, hourly and salaried employees, throughout all of defendant's departments. For example, one named plaintiff sought a janitorial position, while another sought a financial analyst position.... Such a wide range of jobs does not indicate a commonality of facts.")

Plaintiffs' claims are simply not susceptible to generalized proof or defenses. The fact finder will have to consider each of the named plaintiffs' claims on a case-by-case

basis along with the unique defenses Merck will raise to each plaintiff. *See Osgood v. Harrah's Entertainment, Inc.*, 202 F.R.D. 115, 125–26 (D.N.J.2001) (Because the named plaintiff's demotion claim is subject to the specific defense that her own inadequate performance in her assigned position was the reason for the self-described demotion, her claim was not typical of those of the class). Simply put, resolution of the merits of the claims would degenerate into an unmanageable plethora of multiple individual determinations for each individual proposed class member.

Moreover, in the cases decided since *Falcon*, "the courts have made it clear that in cases alleging classwide [discrimination] in particular employment actions, plaintiffs must show a company-wide policy or practice, beyond individualized claims of discrimination." *Abrams v. Kelsey–Seybold Medical Group, Inc.*, 178 F.R.D. 116, 129 (S.D.Tex. 1997) (collecting cases); *Lott v. Westinghouse Savannah River Co., Inc.*, 200 F.R.D. 539 (D.S.C.2000). Here, plaintiffs fail to identify any centralized, uniform policy or practice of discrimination by Merck that formed the basis for discrimination against those employees who work or worked in two different divisions (MMD and USHH) at six separate facilities (West Point, Rahway, Flint River, Somerset, Danville, MARBG) across five different states (Pennsylvania, New Jersey, Georgia, Ohio and Virginia). *See* Plaintiff's Motion for Class Certification at 2. On the contrary, plaintiffs themselves admit that their entire claim is based on individual decisions made by hundreds if not thousands of individual managers at all of these organizations all of whom had varying degrees of autonomy over compensation and promotion decisions. Plaintiffs' Memorandum at 17, 33.

Another court within this Circuit has rejected the contention that such subjectivity in decision-making constitutes a pattern or practice by reasoning:

> [T]he consequences of finding that plaintiffs' claim fits within the pattern-or-practice framework would be that anytime a company gives managers discretion to make employment decisions that company potentially engages in a pattern or practice of discrimination. This is because anytime managers are given discretion they have the opportunity to exercise that discretion in a discriminatory manner. Thus, some may discriminate, while others may not. However, concluding that this situation, without more, is a pattern or practice would bring within the definition of a pattern or practice employment practices that were not intended to be there. This is because a decision by a company to give managers the discretion to make employment decisions, and the subsequent exercise of that discretion by some managers in a discriminatory manner, is not tantamount to a decision by a company to pursue a systematic, companywide policy of intentional discrimination, i.e., a pattern or practice of discrimination.

*Sperling v. Hoffmann–La Roche, Inc.*, 924 F.Supp. 1346, 1363 (D.N.J.1996).

We are cognizant of the fact that the *Falcon* Court left the door open a crack for certifying "across-the-board class actions where 'commonality' and 'typicality' are satisfied but only through 'significant proof that an employer operated under a general policy of discrimination such as through *entirely* subjective decision-making process.'" *General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 159 n. 15, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). (emphasis added). *See also Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1551, 1556 (11th Cir.1986) ("holding that the defendant's selection system was '*entirely* on of subjective evaluation' and that the commonality criterion was satisfied") (emphasis added).; *Shipes v. Trinity Industries*, 987 F.2d 311, 316 (5th Cir.1993) (allegations of the use of "*entirely* subjective" personnel processes to establish commonality or typicality) (emphasis added); *Adams v. R.R. Donnelley & Sons*, —— F.Supp. ——, ——, 2001 WL 336830 (N.D.Ill. Apr.6, 2001), at *11 ("[Defendant's] decentralized personnel policies permit each division to make *entirely subjective promotion decisions* . . . .") (emphasis added).; *Robinson v. Sears, Roebuck & Co.*, 111 F.Supp.2d 1101, 1122 (E.D.Ark.2000) (stating that "*entirely* subjective personnel processes that operated to discriminate [ ] would satisfy the common-

ality and typicality requirements of Rule 23(a) ...") (emphasis added).; *McClain v. Lufkin Industries, Inc.*, 187 F.R.D. 267, 279 (E.D.Tex.1999) ("*entirely* subjective personnel processes that operate to discriminate" to satisfy commonality and typicality).

Plaintiffs have made no such showing here. Indeed, the record reveals that the majority of the potential class members at Merck's West Point, Rahway and Flint River facilities were unionized employees whose compensation and eligibility for promotion is governed by objective procedures such as seniority requirements pursuant to the terms of the collective bargaining agreements in force at each facility.

The record contains other instances of objective factors Merck utilizes in regard to making personnel decisions. For example, with regard to hiring non-skilled employees, Merck looks at the applicant's skills and qualifications, educational background and work history. J. Rancourt Dep. at 57. In deciding which applicants to interview for skilled positions, Merck compares the description of the job in question with the applicant's education, work history and background. *Id.* 47–48. With regard to making promoting decisions, Merck utilizes a number of factors, including an employee's overall performance rating, in evaluating an employee for a promotion outside of the bargaining unit. Id. at 180–182. For promotions inside the bargaining unit, Merck follows the specific procedures in the collective bargaining unit with most jobs filled by seniority as long as that person has the requisite qualifications and meets the criteria that is required for internal transfers. *Id.* at 82–83. Regarding employee evaluations, part of an employee's review requires his or her supervisor to fill out skills profile forms. C. Morris Dep. at 104–106. Supervisors are given detailed written definitions and criteria of what type of employee conduct warrants a particular rating. *Id.* at 107–111. Both an employee's manager and that manager's superior must concur on the results of the evaluations. J. Rancourt Dep. at 181. Regarding training, in order for employees to qualify for involvement in the MMD rotational program, they must (1) have been at Merck at least one year and (2) must be lower than job band five. J. Rancourt Dep. at 141–142. There are other criteria used for admittance to this training program, including an employee's "skills, background, qualifications, and education as it relates to the kind of assignments that a person would have in the rotational development program." *Id.* at 143. Finally, a Merck employee has a number of options if they disagree with a personnel decision, including filing a grievance pursuant to the collective bargaining agreement (if applicable), bringing a complaint to any member of the human resources staff, raising the issue through the ethics office of the Ombudsman or filing an anonymous complaint through a toll-free employee alert line. *Id.* at 84–85, 128–130. See Appendix B to Merck's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification.

Since defendant's decision-making processes with regard to promotion and compensation are at least in part objective based on the collective bargaining agreements and other objective practices, plaintiffs cannot establish that defendants utilized a decision-making process which was *entirely* subjective for purposes of satisfying Rule 23(a)'s commonality and typicality requirements. *See Page v. U.S. Indus. Inc.*, 726 F.2d 1038, 1053, 1054 (5th Cir.1984) ("the record in the instant case indicates that [ ] supervisory personnel, although permitted wide discretion in promotion and wage decisions, were required to make those decisions in accordance with the standards set forth in the union contract .... qualifications required by the collective bargaining agreements provide valid criteria which inject an element of objectivity into the promotion process. Thus, we note that although inclusion of objective standards in the collective bargaining agreement does not eliminate the subjectiveness of an employment practice, it does aid in reducing the possibility that employees will be subjected to discriminatory treatment as a result of discretionary decisionmaking"); *Vuyanich v. Republic Nat'l Bank*, 723 F.2d 1195, 1199–1200 (5th Cir.1984) (finding that an employer's reliance on "two objective inputs—education and experience—in its necessarily subjective hiring process .... precludes reliance on [*Falcon's*] 'general policy of discrimina-

tion' exception" (citations omitted)); *International Union, UAW v. LTV Aerospace and Defense Co.*, 136 F.R.D. 113, 122 (N.D.Texas 1991) (the existence of a collective bargaining agreement governing many of the defendant's decision-making processes "establishe[d] that the process was not entirely subjective").

In sum, other than sharing the common position of being black employees of Merck, the plaintiffs' allegations are discrete and individualized. Plaintiffs were employed in different states, in different divisions, in different facilities and at different levels within the company hierarchy. Their grievances are not susceptible to generalized proof or defenses. In essence, this action is nothing more than a consolidation of 20 accounts of individualized disparate treatment.[2] Plaintiffs have not fully satisfied the commonality and typicality requirements of Rule 23(a).

■ Finally, Rule 23(a) requires plaintiffs to show that they will fairly and adequately represent the interests of the class as named plaintiffs. From a practical standpoint, this requirement also tends to merge with the commonality and typicality requirements, although it also raises issues regarding the ability of class counsel to fully represent the

class, and whether any conflicts are present or will arise between the representative plaintiffs and the class. *Falcon*, 457 U.S. at 158 n. 13, 102 S.Ct. 2364. The court does not doubt the ability of plaintiffs' counsel to litigate an employment discrimination class action. The court is concerned, however, that given the unavoidable factual disparities that will necessarily impact the success or failure of each plaintiff's claims, the 20 plaintiffs will not be able to adequately represent the thousands of diverse factual situations that are relevant to each class member's right of recovery under Title VII. A class representative must possess the same interest and suffer the same injury as the class members. *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). For the same reasons that the court finds the proposed class does not meet the commonality and typicality requirements of Rule 23(a), plaintiffs have not shown that they will adequately represent the interests of all potential class members, and thus a class cannot be certified.

■ For the same reasons we found commonality and typicality were lacking in our Rule 23(a) analysis, we find that a class

---

**2.** Plaintiffs' expert, Harriet Zellner, PhD., performed a multiple-regression analysis in which she analyzes only two types of compensation data pertaining to employees at Merck's Pennsylvania, New Jersey and Georgia facilities: (a) base pay rates of hourly employees at Merck's West Point, Rahway and Flint River locations, (b) base-salaries of salaried employees at West Point and (c) stock options given to salaried employees at West Point. Plaintiffs contend that these data strongly suggest racial discrimination in compensation. For example, plaintiffs point out that in 1999, black hourly workers at the Pennsylvania, New Jersey and Georgia plants earned approximately $1,355-$1,685 per year less than their white counterparts. At the end of 1999, black salaried workers at Merck received about $1268 per year less than their white counterparts and received about 70 stock options less than their white counterparts.

We agree with defendant that Dr. Zellner's analysis of hourly (union) workers is unreliable and irrelevant because it fails to control for the mandated wage rate set by collective bargaining agreements for an employee's position and that her base-salary and stock option analysis of salaried employees is unreliable and irrelevant because neither study controls for job grades. See

Merck's Memorandum of Law in opposition to plaintiffs Motion for Class Certification at 5–10. Since her statistics do not account for non-discriminatory variables such as the effect of collective bargaining agreements and position grades in her analysis, her statistics are not instructive or determinative. *See, Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir.2000) (statistical expert's report found unreliable for summary judgment purposes in part because the analysis failed to account for other variables such as education and experience); *Tagatz v. Marquette University*, 861 F.2d 1040, 1045 (7th Cir.1988) (holding that failure to control for other explanatory variables makes an expert's table "essentially worthless"); *Stastny v. Southern Bell Tel. and Tel. Co.*, 628 F.2d 267, 278–80 (4th Cir.1980) (deeming plaintiff's aggregated statistics insufficient to support a grant of class certification).

In addition, after three years of discovery, the only documented evidence plaintiffs have produced which can even be remotely classified as evidence of racial animus at Merck is a *single* e-mail sent by *one* supervisor in *one* department at *one* facility within the scope of the broadly-defined class. The e-mail itself contains no racial references and refers to employees that includes both whites and blacks. *See* Plaintiffs' Motion for Class Certification at Exhibit G.

action is not maintainable under Rule 23(b)(2). Our Court of Appeals has held that in order to maintain a class under Rule 23(b)(2), the class claims must be cohesive. *Barnes v. American Tobacco Co.*, 161 F.3d 127, 143 (3d Cir.1998). The reason for this cohesive requirement is because in a(b)(2) action, "unnamed members are bound by the action without the opportunity to opt out." *Id.* at 142–143.

Here, there are just too many individual issues which prevent this action from being certified under Rule 23(b)(2). The fact finder would have to review literally thousands of individual decisions made by hundreds of individual managers concerning different types of work occurring over 10 years and at six different facilities. As noted above, all of the named class members claims are subject to unique defenses which would require the fact finder to evaluate all legitimate, non-discriminatory reasons for defendant's employment decisions involving each named plaintiff as well as the potentially 5000 class members. Simply put, in order to resolve each putative class member's claim, the fact finder will be forced to evaluate the individualized facts and circumstances surrounding compensation decisions relating to initial assignments, performance reviews, job postings, promotions and overall compensation. In sum, we find that plaintiffs have not satisfied three of the four elements of Rule 23(a) and also have not satisfied the requirements of Rule 23(b)(2). Accordingly, the motion for class certification is denied.

Having found that plaintiffs' disparate treatment theory does not lend itself to class certification, we now turn to plaintiffs' disparate impact theory.

█ Unlike a disparate treatment case, "disparate impact claims are concerned with whether employment policies or practices that are neutral on their face and were not intended to discriminate have nevertheless had a disparate effect on the protected group." *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 160 (2nd. Cir. 2001), citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Disparate impact claims involve three stages of proof. The first is the prima facie showing of disparate impact. It requires plaintiffs to establish by a preponderance of the evidence that the employer " 'uses a particular employment practice that causes a disparate impact on the basis of race . . . . . ' " *Robinson*, 267 F.3d at 160, citing 42 U.S.C. § 2000e–2(k)(1)(A)(i). To make this showing, a plaintiff must (1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two. *Robinson, id.* As in a disparate treatment case, statistics play a central role in establishing a prima facie showing of a disparate impact claim. *Id.*

If the plaintiffs make a prima facie case, the burden of persuasion shifts to the defendant to demonstrate either that plaintiffs' statistical analysis is invalid or that the challenged practice or policy is " 'job related for the position in question and consistent with business necessity.' " *Id.* at 161, quoting 42 U.S.C. § 2000e–2(k)(1)(A)(i). If the defendant can demonstrate a business justification for the policy or practice, "the burden of persuasion shifts back to the plaintiffs to establish the availability of an alternative policy or practice that would also satisfy the asserted business necessity, but would do so without producing the disparate effect." *Robinson, id* at 161.

If the plaintiffs succeed in establishing a disparate impact violation, the court may order prospective class-wide relief. *Id.* For an employee to obtain individual relief, "[e]ach class member must show that he or she was among those adversely affected by the challenged policy or practice. If this showing is made, the class member is entitled to individual relief unless the employer in turn can establish by a preponderance of the evidence that a legitimate non-discriminatory reason existed for the particular adverse action." *Id.* at 161–162.

Plaintiffs' Amended Complaint contains only one isolated conclusory allegation of disparate impact, i.e. that "Merck's policies, procedures and practices have produced an adverse impact against Black employees with respect to hiring, compensation, promotion, demotion, job assignments, training, transfer, layoff, discharge and discipline." Amended Complaint at 28(g). The polices practices

and procedures plaintiffs refer to essentially are that Merck permits a number of diverse managers and supervisors to make subjective decisions with respect to employment practices. Although basing a disparate impact claim on subjective employment practices was sanctioned by the Supreme Court in *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 990, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), we have already found that the statistics plaintiffs have submitted to support that claim are questionable. In addition, we also found a number of objective criteria that went into defendant's decision-making. As a result, we find that plaintiffs' disparate impact claim is also not amenable to class action treatment.