8

Guadalupe L. GARCIA, et al., Plaintiffs,

v.

Ann V. VENEMAN, Secretary, United
States Department of Agriculture,
Defendant.

No. CIV.A. 00–2445(JR).

United States District Court,
District of Columbia.

Sept. 10, 2004.

Alexander John Pires, Jr., Conlon, Frantz, Phelan & Pires, Alan Mitchell Wiseman, Howrey Simon Arnold & White, LLP, Phillip L. Fraas, Washington, DC, for Plaintiffs.

Jean Lin, Lisa Ann Olson, Elizabeth Goitein, United States Department of Justice, Rupa Bhattacharyya, Washington, DC, for Defendants.

## MEMORANDUM ORDER DENYING CLASS CERTIFICATION

ROBERTSON, District Judge.

This case presents claims of discrimination by Hispanic farmers nationwide who in various ways were denied USDA credit-and non-credit benefits over a period of some twenty years. Before the Court for the second time is the question of whether the case may be certified as a class action. When the question was first presented, by a motion for class certification filed in April 2002, the answer was in the negative, because plaintiffs had not shown, nor did it appear from the record that they could show, a common question of law or fact within the meaning of Fed.R.Civ.P. 23(a). *Garcia v. Veneman*, 211 F.R.D. 15 (D.D.C.2002) (*"Garcia I"*). Plaintiffs noticed an appeal from that order but withdrew the appeal when they were given leave to conduct limited discovery and invited to supplement their motion, Tr. of Jan. 15, 2003 Status Hr'g, at 2. Plaintiffs have now conducted further discovery—although the discovery has by no means been as broad and searching as they wished—and they have presented a supplemental brief on the issue of commonality, which I have treated as a renewed motion for class certification. Be-cause I have concluded that plaintiffs' showing is still insufficient to establish the prerequisites for class certification established by Rules 23(a)(2), 23(b)(2), and 23(b)(3), and that further discovery is unlikely to change the picture, I am today issuing a second order denying class certification. This ruling, taken together with my earlier ruling that plaintiffs' claim of failure to investigate did not state a claim under the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et. seq.* (ECOA), or the Administrative Procedure Act, 5 U.S.C. §§ 701 *et. seq., see* Mem. Order of Mar. 20, 2002, so fundamentally alters the posture of this case that plaintiffs will presumably seek an interlocutory appeal.[1] I will accordingly issue a *sua sponte* order staying proceedings in this Court so that plaintiffs may seek appellate review of the class certification question. *See* Fed.R.Civ.P. 23(f). If asked to do so, I will also certify my Memorandum Order of March 20, 2002 pursuant to 28 U.S.C. § 1292(b).

### Analysis

This Memorandum Order is intended to pick up where *Garcia I* left off, and it should be read in conjunction with that ruling.

### 1. Proceedings since *Garcia I*

In *Garcia I,* I acknowledged the possibility that statistical analysis demonstrating that Hispanic farmers were disproportionately denied credit or non-credit benefits on subjective grounds, such as "character" or "commitment," might support a finding of commonality. At a status conference held on December 18, 2002, shortly after the issuance of *Garcia I,* I noted that certification would require more than anecdotal evidence (the plural of "anecdotes" is not "data"). I said I thought there must be a way to test plaintiffs' hypothesis without inspecting the files of 2700 local offices, and I encouraged plaintiffs to develop a modest discovery plan designed to link USDA's data to what plaintiffs claimed were subjective USDA criteria.

1. It is not for me to say whether this ruling is "questionable," but it may present a "death-knell situation" for plaintiffs. *See In re Lorazepam & Clorazepate Antitrust Litiq.,* 289 F.3d 98, 102, 105 (D.C.Cir.2002). In any event, this certification decision presents an "unsettled and fundamental issue of law relating to class actions, important both to [this] specific litigation and generally, that is likely to evade end-of-the-case review." *Id.* at 105.

At a subsequent status conference, on January 15, 2003, plaintiffs asserted their need for up to 25 depositions and 50 interrogatories, stating that these would involve individuals in the six states where most of the named plaintiffs reside (Texas, California, New Mexico, Florida, Washington, and Colorado). Plaintiffs also wanted to take Rule 30(b)(6) depositions of USDA persons who designed the databases that USDA has said contain all the data that has been captured on its benefit programs, but that plaintiffs already considered nearly useless for their purposes. At that time, I noted that I was trying to find a balance between plaintiffs' legitimate need to take discovery, if they had a colorable commonality claim, and the government's legitimate assertion of burdensomeness. I directed plaintiffs to serve their discovery so that I could evaluate any government objections.

At a status conference held on April 29, 2003, I noted again that there had to be a way to develop a discovery plan that would produce a good random sample. On July 15, 2003, government counsel asserted an inability to fashion such a sample and pointed to the databases that the government had already produced. Plaintiffs' counsel complained that the databases were completely unhelpful because they did not indicate why a particular application had been denied. Tr. of Jan. 15, 2003 Status Hr'g, at 5–6. The government finally produced the loan and disaster benefit files of some 37 of the approximately 110 named plaintiffs. I instructed plaintiffs' counsel to examine those files and to advise me whether "there is in those materials a colorable basis on which plaintiffs can assert that . . . a substantial number of [the named plaintiffs] were rejected for loans or benefits on grounds that are the kinds of subjective grounds that plaintiff[s] assert[ ] [they] can establish commonality for." *Id.* at 22. I suggested that, upon such a showing, I might permit further discovery of other files to provide a basis for a more rigorous statistical comparison. I did not lay down a bright line definition of what I thought would be substantial, but I suggested that 25 out of 37 might be satisfactory while 5 out of 37 would probably not be. *Id.* at 22–23.

## 2. Plaintiffs' submission

In their supplemental brief on the issue of commonality filed on December 5, 2003, plaintiffs reviewed the results of the discovery they had taken. They submitted that they had demonstrated commonality with respect to both disparate impact and disparate treatment claims, and they urged that, should I find otherwise, they be permitted further, broad-ranging discovery.

Plaintiffs' disparate impact theory is that the overall operation of USDA's farm credit and non-credit benefit programs is "one practice" (or that it must be so considered because USDA's failure to collect and maintain data makes it impossible to analyze the effect of separate components); that this "one practice" has had an adverse impact upon Hispanic farmers, as shown by discovery to date; and that class certification is appropriate because this "one practice" is subjective enough to come within any but the most rigid construction of the Supreme Court's dicta in *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 159 n. 15, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Plaintiffs' disparate treatment theory asserts that USDA is itself the "single actor" responsible for a pattern and practice of discrimination against Hispanic farmers (because USDA has acquiesced in or ratified notoriously subjective and discriminatory practices of local offices and county commissioners), and that the sampling of evidence plaintiffs have been able to gather from the files they have examined reveals five sub-patterns of discrimination, any one of which would also support a finding sufficient to satisfy the commonality requirement of Rule 23(a)(2): (I) refusal to provide Hispanic farmers with loan applications or assistance in completing applications; (ii) subjecting Hispanic farmers to protracted delays in processing and funding their loans; (iii) using subjective criteria to reject the applications of Hispanic farmers; (iv) unnecessarily subjecting Hispanic farmers to the inconvenience of supervised bank accounts; and (v) delaying or denying loan servicing for Hispanic farmers.

At the same time that they submitted their supplemental brief, plaintiffs moved for leave

to file a third amended complaint, setting forth five subclasses of Hispanic farmers, drawn to fit the sub-patterns plaintiffs claim to have discovered. Pls.' Proposed Third Am. Class Action Compl., ¶ 103.[2]

### 3. Disparate impact theory

■ The plaintiff in a disparate impact case must "isolat[e] and identif[y] the specific employment practices that are allegedly responsible for any observed statistical disparities," *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Plaintiffs have sought to finesse that requirement by asserting that isolation and identification are impossible because USDA did not keep adequate records. I rejected a variant of that argument in *Garcia I* as "unsupported by case authority and unpersuasive," 211 F.R.D. at 21 n. 6, but now plaintiffs have invoked the 1991 amendments to Title VII, 42 U.S.C. § 2000e–2(k)(1)(B)(I)—Congress's response to the burden of proof holding in *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)—to assert (by analogy to employment law) that USDA's entire decision-making process must be considered "one ... practice" because its separate components cannot be analyzed. Pls.' Mem. in Resp. to Ct.'s July 15, 2003 Order With Respect to Commonality, at 8 ("Pls.' Mem."). It is a creative argument, but ultimately an unpersuasive one. Not only does it "leapfrog to the merits," contrary to the teaching of *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), as the Government observes, Def.'s Opp'n to Class Certification & Resp. to Pls.' Dec. 5, 2003 Mem. Regarding Commonality, at 4, but it also boils down to the proposition that unexplained discrepancies in the distribution of government benefits satisfy the commonality requirement of Rule 23(a)(2) without more. That proposition is untenable. Anecdotal proof of discrimination against Hispanic farmers, and even statistical proof that Hispanic farmers have received proportionally less assistance than others, will not be enough to support class certifica-tion. *Falcon* reminds us that the underlying purpose of the Rule 23(a)(2) commonality requirement is to permit the court to define the class and determine whether the representation is adequate, to let the defendant know how to defend, and " 'most significant[ly]' " to guard against the "potential unfairness to the class members bound by the judgment if the framing of the class is overbroad." 457 U.S. at 161, 102 S.Ct. 2364, (quoting *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122(5th Cir.1969)). That is why " 'precise pleadings' " with " 'reasonable specificity' " are required. *Id.* at 160–01, 102 S.Ct. 2364. The plaintiffs in this case have not identified a USDA credit or disaster benefit practice established at the national level that comes close in specificity to the example of a common question offered by the Supreme Court in *Falcon* ("a biased testing procedure to evaluate both applicants for employment and incumbent employees," 457 U.S. at 159 n. 15, 102 S.Ct. 2364). Without such specificity, *Falcon* teaches against class certification, except possibly in the "conceivabl[e]" case where there is *both* "significant proof" that the defendant "operated under a general policy of discrimination" *and* "the discrimination manifested itself ... in the same general fashion, such as through entirely subjective decisionmaking processes." *Id.* As discussed in later sections of this memorandum, plaintiffs have neither shown that they can satisfy that test nor established probable cause to believe that they could do so, if only they could take more discovery.

### 4. Disparate treatment theory

■ Plaintiffs assert (again "leapfrogging to the merits") that USDA was on notice of discrimination against Hispanic farmers and that the Secretary "acquiesced in and ratified" that discrimination by failing to take meaningful corrective measures. That construction of the alleged facts appears to be an effort to sidestep my conclusion in *Garcia I* that "[c]ommonality is defeated ... by the large numbers and geographic dispersion of the decision-makers," 211 F.R.D. at 22, so that, having identified a "single actor," plaintiffs may go on to assert USDA's liability for

---

**2.** The amended complaint would also add and emphasize prayers for equitable relief, since *Garcia I* rejected Rule 23(b)(2) certification on the ground, *inter alia,* that the original complaint had sought only limited declaratory relief and "no injunctive relief at all." 211 F.R.D. at 23.

a pattern and practice of discouraging Hispanic farmers from availing themselves of farm credit and non-credit programs. Pls.' Mem., at 30–32. (Plaintiffs then go on to identify five sub-patterns and practices by which USDA allegedly "discouraged" Hispanic farmers: denying applications and assistance, delaying processing, using "highly subjective criteria," subjecting them to supervised bank accounts, and delaying or denying loan servicing. These alleged practices have become the labels for the five subclasses plaintiffs now seek to represent.)

I will step over the threshold question of whether a private pattern and practice cause of action can ever be maintained under ECOA.[3] Neither side has briefed the issue, and I will assume for the sake of argument that plaintiffs' pattern and practice claims are cognizable. On the other side of the threshold, however, lies a question that cannot be assumed away, namely, whether plaintiffs' sweeping allegations of departmental acquiescence and ratification will support class certification in view of *Falcon's* concern about "across-the-board" discrimination claims and its insistence upon specificity in pleading. That question must again be answered in the negative. First, plaintiffs' reliance upon *EEOC v. Inland Marine Industries*, 729 F.2d 1229 (9th Cir.1984), *Baer v.*

*First Options of Chicago, Inc.*, No. 90 C 7207, 1993 U.S. Dist. LEXIS 19489 (N.D.Ill. Dec. 3, 1993), and other similar cases is misplaced. Those cases do stand for the proposition that a pattern of notice and refusal to correct can serve as proof of the intent element in an employment discrimination case, but they do not address the implication of such a pattern upon class certification. The holdings of those cases would not support a conclusion that USDA's alleged acquiescence and ratification would be enough by itself to satisfy the commonality requirement. Proof of conscious inaction on the part of USDA (*i.e.*, acquiescence and ratification) in the face of numbers demonstrating that Hispanic farmers suffered disproportionately high loan rejection rates and received disproportionately low disaster benefit payments might satisfy the first *Falcon* requirement of a "general policy of discrimination," but it would be no help at all with respect to the second *Falcon* requirement of decision-making processes that were "entirely subjective." The common discriminatory practice that *Falcon* and its progeny requires is still missing.

### 5. Subjective decision-making process

■ The class that plaintiffs seek to represent would include Hispanic farmers who

---

**3.** Pattern or practice *employment* cases were originally legislatively created, first as cases that could be brought only by the Attorney General, and then as cases that could be brought by the EEOC. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 328 n. 1, 336 n. 16, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Although the history is somewhat murky, private class action pattern or practice litigation appears to be a judge-made construct that arose from developments in class action litigation and the "private attorney general" concept. *See, e.g., Cooper v. Fed. Reserve Bank*, 467 U.S. 867, 876 n. 9, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984); *Int'l Bhd. of Teamsters*, 431 U.S. at 358–60, 97 S.Ct. 1843 (1977); *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760 (4th Cir.1998), *vacated on other grounds by* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999). *See generally* Robert Belton, *A Comparative Review of Public and Private Enforcement of Title VII of the Civil Rights Act of 1964*, 31 Vand. L.Rev. 905, 919, 934 (1978). There is no language in the ECOA statute supporting private pattern or practice cases. The statute contains pattern or practice language, *see* 15 U.S.C. § 1691e(h) ("[W]henever he has reason to believe that one or more creditors are

engaged in a pattern or practice in violation of this subchapter, the Attorney General may bring a civil action...."), but on its face appears to contemplate only the government as plaintiff. ECOA law has nevertheless been held generally to track Title VII. *See, e.g., Haynie v. Veneman*, 272 F.Supp.2d 10, 16 (D.D.C.2003) (analogizing ECOA to Title VII); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215 (1st Cir.2000) ("In interpreting the ECOA, this court looks to Title VII case law...."). *But see Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 713–15 (7th Cir. 1998) (rejecting the Title VII burden-shifting model for ECOA). That may be the reason why a number of courts have simply assumed without discussion or analysis that ECOA's pattern or practice language supports a private cause of action. *See, e.g., Hargraves v. Capital City Mortg. Corp.*, 140 F.Supp.2d 7, 14 (D.D.C.2000); *Sallion v. SunTrust Bank, Atlanta*, 87 F.Supp.2d 1323, 1327 (N.D.Ga.2000); *Rodriguez v. Ford Motor Credit Co.*, No. 01 C 8526, 2002 WL 655679, at *5 (N.D.Ill. Apr.19, 2002), *Massey v. First Greensboro Home Equity, Inc.*, No. 97–1292–CIV–T–17, 1998 WL 231141, at *9 (M.D.Fla. Apr.27, 1998). No court has squarely so held.

suffered discrimination at the hands of county agents or county committees—hundreds and perhaps thousands of decision-makers in who knows how many of the 2700 county offices nationwide that number Hispanic farmers among their clientele. *Garcia I*, 211 F.R.D. at 22. As so described, the class presents insurmountable problems for plaintiffs in meeting what the Fourth Circuit has called the "critical" need to identify "the locus of autonomy in making the challenged ... decisions." *Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 279 (4th Cir.1980). *Compare id. with Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir.1986) (commonality supported where "evidence was offered to show that many of the decisions affecting employees' opportunities for transfer, training and promotion were made by the same, central group of people...."). *See also Webb v. Merck & Co.*, 206 F.R.D. 399, 406 (E.D.Pa.2002) (finding class certification inappropriate where employment decisions were made by managers with varying authority in six facilities across five states); *Carson v. Giant Food, Inc.*, 187 F.Supp.2d 462, 471 (D.Md.2002) (finding class certification inappropriate when alleged discrimination involved thirteen facilities in five towns or cities), *aff'd sub nom Skipper v. Giant Food Inc.*, No. 02–1319, 2003 WL 21350730 (4th Cir. June 11, 2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 929, 157 L.Ed.2d 744 (2003); *Zachery v. Texaco Exploration & Prod., Inc.*, 185 F.R.D. 230, 239 (W.D.Tex. 1999) (finding class certification inappropriate when alleged discrimination made by five

hundred and twenty-three autonomous supervisors in fifteen states). That is why plaintiffs' argument for commonality has focused from the beginning on the subjectivity of USDA's county committee decision-making process. Plaintiffs must either bring their claims under the "entirely subjective" rubric that the Supreme Court thought might "conceivably" satisfy Rule 23(a)—or fail on their class certification motion.

Before 1997, USDA's regulations set forth seven eligibility criteria:

(1) United States citizenship;

(2) Legal capacity to incur loan obligations;

(3) Education and/or farming experience (at least "1 year's complete production and marketing cycle within the last 5 years");

(4) Character (emphasizing credit history, past record of debt repayment, and reliability) and industry to carry out the proposed operation;

(5) Commitment to carry out undertakings and obligations;

(6) Inability to obtain "sufficient credit elsewhere to finance actual needs at reasonable rates and terms...."; and

(7) Farm size (not to be larger than a family farm).

7 C.F.R. § 1941.12 (1997). *See also* 7 C.F.R. § 1943.12 (1997).[4]

In addition to satisfying those criteria, a farmer also had to submit a Farm and Home Plan, which had to meet with the approval of

---

**4.** In March 1997, the regulations were amended to include eleven eligibility criteria and to make them generally more objective:

(1) United States citizenship;

(2) The legal capacity to incur loan obligations;

(3) Education and/or farming experience (at least "1 year's complete production and marketing cycle within the last 5 years");

(4) Character (emphasizing credit history, past record of debt repayment, and reliability) and industry;

(5) Commitment to carry out undertakings and obligations;

(6) Inability to obtain "sufficient credit elsewhere to finance actual needs at reasonable rates and terms....";

(7) Farm size (not to be larger than a family farm);

(8) and (9) Loan history (restricting the number of prior years in which the applicant could have taken out a direct operating loan);

(10) No previous debt forgiveness causing a loss to the USDA; and

(11) No delinquency on any federal debt.

7 C.F.R. § 1941.12 (1998); 62 Fed.Reg. 9351, 9354 (Mar. 3, 1997). In February 2003, subsequent to my initial class certification decision in *Garcia I*, these regulations were amended again to eliminate the character and commitment criteria, deeming them "obsolete." 68 Fed.Reg. 7693, 7694 (Feb. 18, 2003).

The *pre–1997* criteria were in force during a good portion of the putative class·period.

the loan officer. A feasible plan is defined as:

> [A] plan based upon the applicant/borrower's records that show the farming operation's actual production and expenses. These records will be used along with realistic anticipated prices, including farm program payments when available, to determine that the income from the farm operation, along with any other reliable off farm income, will provide the income necessary for an applicant/borrower to at least be able to:
>
> (a) Pay all operating expenses and all taxes which are due during the projected farm budget period;
>
> (b) Meet necessary payments on all debts; and
>
> (c) Provide living expenses for the family members of an individual borrower or a wage for the farm operator in the case of an entity borrower which is in accordance with the essential family needs. Family members include the individual borrower of farm operator in the case of an entity, and the immediate members of the family who reside in the same household.

7 C.F.R. § 1941.4.[5] I concluded in *Garcia I* that some of these eligibility criteria, such as "character" or "commitment," are obviously subjective, while others, such as citizenship, legal capacity, inability to obtain credit elsewhere, and farm size, should be classified as objective. I also ruled that the eligibility factors added in 1997 were objective: loan history, lack of previous debt forgiveness, and no delinquency on any federal debt. Overall, I concluded that, because the decision-making process was guided by a number of objective factors, footnote 15 was not triggered.

Plaintiffs ask me to reconsider that overall conclusion, insisting that, of the seven factors set forth in the pre–1997 regulations—citizenship, legal capacity, education/experience, character, commitment, inability to obtain credit elsewhere, and farm size—only citizenship and legal capacity are truly objective. Plaintiffs argue that the "inability to obtain credit elsewhere" criterion, which I found to be objective in *Garcia I,* is actually open to subjective interpretation and application. The regulation provides that an applicant is eligible for a loan only if he or she could not obtain sufficient credit elsewhere to "finance . . . actual needs at reasonable rates and terms, taking into consideration prevailing private and cooperative rates and terms in the community in or near where the applicant resides for loans for similar purposes and periods of time." 7 C.F.R. § 1941.6. Plaintiffs argue that there was considerable room for local officials to interpret this factor, because, they assert, for most of the time period relevant to this suit, county committees were responsible for determining what were an applicant's "actual needs," what constituted "reasonable rates and terms," and which legal institutions were deemed "near" the applicant's residence. Plaintiffs also maintain that county officials had discretion to define what constituted a "family farm." The applicable regulation defines a family farm as one which, *inter alia,* "produces agricultural commodities for sale in sufficient quantities so that it is recognized in the community as a farm rather than a rural residence." 7 C.F.R. § 1941.4. Plaintiffs also assert that approximately one-third of the examined loan rejections were done "on the basis of character or other similarly highly subjective criteria." Pls.' Mem. Ex. 7. And, plaintiffs place considerable emphasis on the USDA requirement that Farm and Home Plans be "feasible." Infeasibility appears to have been the reason given for more than half of the loan rejections plaintiffs have been able to review. The feasibility determination is guided by a number of objective inputs, however, including the applicant's own records of the farming operation's actual production and expenses. 7 C.F.R. § 1941.4. These records are combined with other estimates of actual prices to determine feasibility. *Id.* Even plaintiffs' anecdotal evidence shows that feasibility was grounded, at least in many cases, on objective financial data. *See* Pls.' Mem. Ex. 7.

Many of plaintiffs' arguments for reconsideration of my commonality finding are well

---

5. This provision was in force for a good portion of the putative class period.

taken, and taken together they do increase the subjectivity quotient of the USDA processes. The question is, have plaintiffs succeeded in raising the subjectivity quotient to the point where it can be said to be "entirely subjective"? The answer is no. Am I treating the words "entirely subjective" literally, as revealed truth? Again, no. Indeed, there can be no satisfactory resolution to the dispute about just how subjective is "entirely subjective" within the meaning of the Supreme Court's oracular *Falcon* footnote (which is dicta anyway). Judge Huvelle recently found the test to have been met in *McReynolds v. Sodexho Marriott Services, Inc.,* 208 F.R.D. 428, 441–42 (D.D.C.2002), an employment case in which the choice of hiring and promotion criteria was left entirely to the individual discretion of thousands of decision-makers at thousands of sites across the country. The line may not be clear, but whatever can be said about the USDA processes for making loans and giving disaster relief to farmers, they are (or were) certainly not so subjective as that, or as the process recently described in *Dukes v. Wal–Mart Stores, Inc.,* No. C01–02252, 222 F.R.D. 137 (N.D.Cal.2004).

### 6. *Commonality within proposed subclasses*

Plaintiffs appear to be arguing that several of the subclasses they propose to define and seek to represent meet the standard for commonality wholly apart from any analysis of subjectivity. They assert that:

■ "Thirty-four named plaintiffs were either denied applications altogether or refused requested assistance in completing the loan application." Pls.' Mem. Ex. 8.

The stories of those 34 plaintiffs include many variations. One plaintiff was told to apply first to private banks; another was told that he did not have enough collateral and was not "offered" an application; another was told no disaster relief funds were available; another was treated rudely and was refused assistance in filling out the necessary forms. These are, essentially, thirty-four anecdotes about poor treatment given to individual Hispanic farmers at eight of USDA's 2700 offices.

■ USDA "discouraged Hispanic farmers from availing themselves of farm credit by delaying the processing of their loan applications." Pls.' Mem., at 34.

A narrative presented in Exhibit 9 of Plaintiffs' Memorandum asserts that 28 of the 35 named plaintiffs for whom discovery has been received experienced "significant delays in receiving benefits related to farm programs," and that these delays were "in violation of the dictates of law and the dictates of morality." The material submitted in support of this claim consists of stories of bureaucratic delays, each one different from the other.

■ USDA "discouraged Hispanic farmers from availing themselves of farm credit by delaying or denying loan servicing." Pls.' Mem., at 37.

Here again the individual stories of the named plaintiffs are anecdotes of bureaucracy, geographically dispersed, and quite different one from another. *See* Pls.' Mem. Ex. 11.

■ USDA "discriminated against Hispanic farmers through the misuse of supervised bank accounts." Pls.' Mem. Ex. 10.

The deposit of loan proceeds or disaster payments funds into supervised bank accounts ("SBAs") imposes significant burdens on farmers. SBA's should be used only temporarily "to help the borrower learn to properly manage his/her financial affairs" and normally not for more than a year. 7 C.F.R. § 1902.2(a)(6), (a)(4). Plaintiffs allege that SBA's are frequently imposed on Hispanic farmers only because they cannot speak English, for no reason related to their farming experience or ability to manage their financial affairs, and for periods of longer than a year. That allegation is serious and comes closer than any of the others to fulfilling the requirements for class treatment. It may be that, as the plaintiffs pursue their individual cases, facts will emerge that could support class treatment of this claim in individual offices or in larger districts. *Cf. Castano v. Am. Tobacco Co.,* 84 F.3d 734 (5th Cir.1996) (finding class certification inappropriate for "immature" tort that could best be first developed in individual litigation). On the basis of the record in its present state of develop-

ment, however, even if the SBA issue provided the requisite commonality, the requirements of Rule 23(b) have not been satisfied.

### 7. *Rule 23(b) questions*

■ Even if plaintiffs' proposed subclasses satisfy the commonality requirement of Rule 23(a)(2), they do not pass muster under Rule 23(b)(2) or Rule 23(b)(3).[6] Plaintiffs have done what they can to shore up their claim to represent a valid Rule 23(b)(2) class by seeking broad and carefully tailored injunctive relief in their proposed third amended complaint,[7] but their assertion that USDA "has acted or refused to act on grounds generally applicable to the class" depends upon the same "one practice" and "single actor" theories by which plaintiffs have sought to establish Rule 23(a) commonality, and which have already been rejected. As for Rule 23(b)(3), the discovery difficulties that have been encountered in this case and the diversity of the plaintiffs' anecdotal support for their class certification motion underscore my observations in *Garcia I* that, if this case were permitted to proceed as a class action, it would "quickly devolve into hundreds or perhaps thousands of individual inquiries about each claimant's particular circumstances," and that "[e]ven if the presence of classwide discrimination were established, individual issues would be much more important to any claimant's recovery." 211 F.R.D. at 24. The history of the *Pigford* (black farmers) class action litigation[8] amply demonstrates that the certification of a plaintiff class to resolve decades of disputes about loans made or not made and disaster relief provided or not provided to thousands of individual farmers, working under disparate conditions and submitting applications to hundreds of different decision-makers (to say nothing of loan applications offered or not offered, loan applications delayed or not delayed, supervised bank accounts required or not required, and loan servicing provided or not provided), would be only the beginning of a lengthy and difficult process in which, as it turns out, it is the "questions affecting only individual members" that predominate. *See* Fed.R.Civ.P. 23(b)(3).

### 8. *Further discovery*

Plaintiffs will object—have already objected—that the denial of class certification at this point is uninformed by the information they might be able to develop through the broad discovery program that has been denied them until now, and that to restrict their discovery to unhelpful and uninformative USDA databases and to the loan files of their own clients unreasonably limits their ability to demonstrate the broader pattern of discrimination that they believe has existed over the last twenty years of USDA administration of farmers' loan and disaster relief programs. That objection is overruled. What plaintiffs have been able to assemble and present so far does not give rise to probable cause to believe that a searching and expensive discovery program would unearth sufficient evidence of commonality to support class certification. The examination of individual loan files requested is labor intensive, time consuming, and is no different, or little different, from the kind of discovery that would be necessary to deal with these cases individually.

### 9. *Amendment of the complaint*

Plaintiffs' proposed Third Amended Complaint, as already noted, would add five subclasses of plaintiffs and assert prayers for injunctive relief. Leave to amend pleadings is to be "freely given when justice so requires." Fed.R.Civ.P. 15(a). Because the ruling set forth in this Memorandum Order alters the landscape of this case, however, the appropriate course is to deny leave to amend, without prejudice.

\* \* \* \* \* \*

---

**6.** I recognize that since *Garcia I* the parties have focused their briefs on Rule 23(a)(2) commonality and imagine that plaintiffs might have more to say about Rules 23(b)(2) and (b)(3). I do not believe that yet another round of briefing would be productive, however.

**7.** And see Submission of Plaintiffs Concerning the Nature of the Injunctive Relief Sought by Plaintiffs' Proposed Third Amended Complaint, filed September 2, 2004.

**8.** *Pigford v. Veneman*, 1:97–cv–01978–PLF (D.D.C.)

For the reasons set forth above and in *Garcia I* it is

**ORDERED** that plaintiffs' motion for class certification [18], as renewed or supplemented by plaintiffs' memorandum on the subject of commonality [107], is **denied.** It is

**FURTHER ORDERED** that plaintiffs' motion for leave to file a third amended class action complaint [108] is **denied without prejudice.** It is

**FURTHER ORDERED** that defendant's motion to strike [131] is **denied.** And it is

**FURTHER ORDERED** that further proceedings in this case are **stayed** pending further order of the Court.