Holly MATHERS, Sue Gundy, Rose Seelen and Dianne Thiel, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

NORTHSHORE MINING CO., a Minnesota Corporation, Defendant.

No. Civ.99–1938 MJD/RLE.

United States District Court, D. Minnesota.

Sept. 15, 2003.

Joseph J. Mihalek, Fryberger, Buchanan, Smith & Frederick, Duluth, MN, for and on behalf of the Plaintiffs.

Kathleen S. Bray, Hanft Fride, Duluth, MN, for and on behalf of the Defendant.

## Memorandum Opinion & Order

DAVIS, District Judge.

This matter is before the Court upon Plaintiffs' Motion for Class Certification, Defendant's Motion for Exclusion of Experts, and Defendant's Motion for Summary Judgment. For the reasons set forth below, Plaintiffs' Motion for Class Certification is conditionally **GRANTED,** Defendant's Motion for Exclusion of Expert Report and Testimony is **DENIED,** and Defendant's Motion for Summary Judgment is **DENIED.**

## BACKGROUND

Plaintiffs' Complaint asserts claims of both intentional discrimination and disparate impact. The Plaintiffs seek both monetary damages and injunctive relief. The Court bifurcated discovery in this case, and discovery related to class certification has been completed. The Plaintiffs claim discrimination in training opportunities, job assignments, overtime, promotions, and compensation under both Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn.Stat. § 363.01 *et seq.*

## FACTUAL BACKGROUND

Defendant Northshore Mining Company ("NSM") operates open pit iron ore mining and taconite pellet production facilities in Babbitt and Silver Bay, Minnesota. NSM employs approximately 525 people who perform jobs in all phases of mining iron ore and taconite pellet production. Approximately 150 of those employees are located in Babbitt. NSM's operations are divided into several different departments. Each department has a department head and all department heads are male. NSM has ten supervisors, nine of whom are male.

### A. Promotions

Employees are classified as hourly, exempt or non-exempt salaried employees. From 1994 to 2000, the number of female employees working for NSM as hourly or non-exempt employees ranged from 39 at its lowest to 50 at its highest. Most hourly and non-exempt employees are also classified by "tech" levels, ranging from Tech IV (starting position) to Tech I and Senior Tech (highest position), based on equipment operating skills, knowledge, and ability. Every employee at the same tech level is to receive the same rate of pay. As employees move from tech level to tech level, their compensation increases and advancements are made to exempt supervisory positions. Promotional criteria and guidelines vary by department. However, the general framework for promotions is the same throughout NSM.

Promotions for Mine Operations Technicians are governed by the Tech level promotion guidelines in place for that department. Promotion beyond the starting Tech level is dependent on individual capabilities and motivation, work performance history, including safety record, attendance, and job performance and whether the company has a need for employees at higher Tech levels. In the Mine Operations Department employees who have mastered the four operating Tech Levels can seek qualification for promotion to Senior Tech by satisfactorily performing leadership roles within the department.

An employee in the Mine Operations Department who wants to be promoted completes a "Request for Promotion" form,

which must be provided to the Section Manager. The Section Manager forms a review committee of peers along with a Human Resources Representative, for the purpose of evaluating the employee's skill level and readiness for promotion. This occurs only after the Department Head has reviewed the application and recommended promotion. The committee then makes a recommendation either to promote or not to promote. The recommendation is relayed to the Mine Area Manager either who denies or approves the recommendation.

The promotional policies and procedures have changed since Plaintiff Holly Mathers' ("Mathers") hire date in 1994 and the present. For example, effective January 1, 1995, the company instituted a 45–day review policy to determine whether employees were hired at the appropriate Tech level, but suspended the policy shortly thereafter due to its lack of success.

In 1998, after NSM received a complaint from Mathers regarding discrimination in NSM's promotion of female employees, it reviewed its promotion records and John Sandstrom, NSM's former senior manager of human resources, prepared a report setting forth the time period during which various employees worked at a given tech level before being promoted to the next tech level. The June 24, 1998 report states that women were, on average, promoted more slowly than men.

### B. Assignments

Four crews operate at the Mine Operations Department in Babbitt with each crew working an assigned shift on a rotating basis. The crews are self-contained and work on a "team" concept with the Shift Coordinator or Control Room Operator assigned to that crew making the equipment assignments. The assignments are to be determined according to the company's needs and the employee's interests and skills. An employee's Tech level and the crew's training needs contribute to decisions regarding assignments.

### C. Training

Training procedures and practices vary by department, due to differences in operating requirements and equipment utilization. Training for non-exempt staff or administrative employees is to be provided based on the specific department's needs and the employee's education, skills and interests among other factors. The Mine Operations Department requires training for non-exempt technicians in the areas of safety (as regulated by the Mine Safety and Health Administration (MSHA)), personal development, equipment operations, advanced equipment training, and equipment proficiency. Training is scheduled based on the availability of classes, instructors, equipment and the level of staffing the Department requires.

### D. Overtime

NSM's written overtime policy provides that "[o]vertime will be distributed equitably among the employees within each work unit." The overtime procedures, however, vary throughout the company. Non-exempt staff typically work Monday through Friday with overtime usually not required or available. Non-exempt technicians who work in the operating departments normally work a 7–day rotating shift schedule and are to be assigned overtime equitably. In January 1996, the Mine Operations Department instituted a new overtime system to assign and track overtime opportunities. According to the system, the person with the least amount of overtime on the crew is asked whether he or she wants to work the available overtime. If not, that employee is "charged" the number of hours he or she refused. If the employee does work the overtime hours, it is recorded as overtime worked on his or her records. The policy may vary if a specific task or skill level is required, in which case only qualified employees are considered.

### E. Discrimination Policy

NSM's Employee Handbook prohibits discrimination on the basis of gender. The anti-discrimination policy commits NSM to take "affirmative action to ensure that all employment practices are free of such discrimination. Such employment practices include,

but are not limited to ... upgrading, selection, disciplinary action, rate of pay or other forms of compensation and selection for training." NSM Employee Handbook at 2–1. NSM provides anti-discrimination training to its employees. However, NSM does not make the training mandatory, and it does not keep a record of which employees did not receive the training.

Complaints regarding discrimination are directed to NSM's human resources director who is to investigate all complaints. The supervisor, area manager, and human resources manager make final decisions on discrimination complaints. Throughout the 1990's, NSM received between three and five gender related complaints.

### F. Proposed Class Representatives

Plaintiffs Mathers, Sue Gundy ("Gundy") and Rose Seelen ("Seelen") are employed in the Mine Operations Department in Babbitt as non-exempt technician employees. At the time this action was filed in December 1999, Mathers was a Tech I, Seelen was a Tech II, and Gundy was a Tech I. Gundy has since been promoted to Senior Tech. Plaintiff Diane Thiel was a non-exempt staff employee (administrative assistant) in Babbitt from November 1997 until her voluntary resignation from employment in May 2001. Previously, Thiel had been employed as a technician in the Babbitt Mine Operations Department from 1990 until 1993, and then in the Babbitt Railroad Department from 1993 to November 1997.

### 1. Holly Mathers

Mathers started working for NSM in 1994 as an hourly, non-exempt employee at a Tech IV level. Within 45 days of hire, she requested review to receive a promotion to Tech III retroactive to the date of hire. She was denied the promotion although she believed she could run almost every piece of equipment.

Shortly after her hire, NSM hired a male employee named Bryan Rusco. He had owned a bakery business for thirteen years and did not have mine experience. NSM, however, promoted Rusco to Tech III under the same policy, which denied Mathers.

Mathers waited an additional six months after her hire to be promoted to Tech III. NSM used the 45–day review policy to retroactively promote 14 male employees (14 out of 20 men) from the Mine Operations Department; however, no female employee received a retroactive promotion.

Mathers' initial involvement at NSM was as an intern in the crusher. After completing her internship, she operated a side dump truck on Crew 1 for approximately two years. She states that she received very limited exposure to any other equipment. During this time, Mathers realized that males hired after her were being taken off trucks and given training on the operation of NSM's other equipment, which would enhance their promotion potential. On one occasion, Mathers approached her crew supervisor, Don Maroney, about running the backhoe. He told her that she could not run the backhoe because she [was] a girl and that NSM only lets certain male employees run the backhoe. Mathers asked to be trained on the other equipment as well, but NSM repeatedly refused to allow her to be trained. On three specific occasions, male employees who were hired after Mathers were promoted or offered training while Mathers was never offered the opportunity. At one point, Mathers asked about being promoted to Senior Tech and submitted the necessary paperwork. NSM told her she would have to come in to work extra hours to get the computer training necessary for the promotion. However, she asserts that a junior male employee was allowed to complete his computer training as part of a regular job assignment.

Pursuant to the Mine Safety Health Act, all employees must complete mandatory safety training and receive certification from the Federal Mine Safety Administration before they are permitted to work on mining property. This training is in addition to training required to establish competency in operating equipment and to develop advanced skills in operating equipment. Mathers recalls incidents where male employees were involved in a safety incident or accident, it was overlooked or made light of. In contrast, female employees were disciplined for less serious safety incidents. Mathers also observed that

because women were not given opportunities to operate the equipment, they were being denied MSHA certification.

Mathers also believes NSM discriminated against women with respect to overtime. NSM's policy was to implement an overtime list and overtime was supposed to be offered on a rotational basis according to seniority. When an employee declined to work overtime, it was required to be recorded on the overtime list so the employee declining overtime was placed at the bottom of the list for the next available overtime. When female employees refused overtime, the refusal was recorded; but when male employees refused overtime, the refusal frequently was not recorded so the male employee would stay at the top of the list.

Based on information that NSM provided to Mathers at the time she filed her formal EEOC charge, of the ten women in her department, only one woman was a Senior Tech and only 1.8 percent of the Tech I's were women. The women waited an average of thirty-nine months for promotions to Tech I, while male employees waited twenty-two months. The women waited an average of 49.88 months since last promotion, while the men waited thirty-nine months. The women waited an average of 5.87 months for promotion to Tech III, while the men waited an average of 2.84 months. On June 24, 1998, twelve of the thirteen Senior Techs were men, and in 2001, sixteen of twenty Senior Techs were men.

## 2. Susan Gundy

Gundy began working with NSM in the pelletizer at the Silver Bay facility in 1994. She transferred to the Babbitt facility in 1995, and is now an hourly, non-exempt employee.

When Gundy transferred, she had an MSHA certification. However, NSM told Gundy that her MSHA certification was not valid. Gundy was aware that NSM had accepted prior valid MSHA certifications presented by male employees. When Gundy asked when she would be trained on the equipment necessary for MSHA certification, she was told that there were other less sen-

ior male employees who needed to be trained first so they could get promoted to Tech II.

Specifically, Gundy recalls an incident where she was denied training to operate new loaders. Although she was more senior and had asked specifically to be put on the loader, NSM allowed her to operate it only for limited times. In contrast, the less senior male employees ran the loaders daily. Gundy had to ask to be placed on certain equipment, while male employees were automatically assigned. According to Gundy, she was also denied training on the grader, the loader, production trucks with the loaders, cable trucks and running the manual controls. Consequently, at least eight junior male employees received their MSHA certification on the production loader before her; nine junior males received training on the grader before her; and, four junior males received training on the tire dozer before her. Therefore, Gundy asserts that NSM rotates men on the equipment so they can develop their operating skills, while women are not equally assigned to operate the equipment.

Gundy also claims discrimination regarding overtime disbursement. She testified that men were awarded overtime even when women had fewer overtime hours and should have been given priority or preference. She further asserts that women were denied training on certain pieces of equipment that generated more overtime.

After working for NSM for seven years, Gundy recently received promotion to Senior Tech. Other less senior male employees were promoted to Senior Tech well before she was. NSM explained that the delay in promotions was due to Gundy's lack of training on production loaders. Gundy claims that she was denied training and job assignment time on the production loaders, while less senior male employees were assigned to run the production loaders daily.

## 3. Dianne Thiel

Thiel began working for NSM in 1990 as an hourly, non-exempt employee. She was hired as a laborer, performing such tasks as working in the crusher, working in the cleaner, driving the production truck, driving the water truck, and operating the grader, dozer

and front-end loader. Thiel noticed that male employees were trained on the grader, dozer, front-end loader, and other equipment more rapidly than the female employees. She also noticed that women were assigned to operate the equipment much less frequently than male employees.

In 1993, Thiel transferred from the mine pit to the railroad. In 1997, she was transferred to an administrative assistant position. Thiel first applied for a promotion to Tech I in 1994, but did not receive it for over two years. According to Thiel, when she was initially denied the promotion NSM told her the reason was because she was a woman.

Thiel was transferred to an administrative assistant position after she had work restrictions due to an injury. Her pay was cut from $18.40 to $11.40 per hour. Her job as an equipment operator was given to a male employee. Thiel observed that male employees with work restrictions were not required to take pay cuts or work straight days, and were given different job duties to enable them to hold their position and pay rate.

### 4. Rose Mary Seelen

Seelen began working at NSM in 1989 as an hourly, non-exempt employee, and has worked in both the crusher and the mine pit. She contends that NSM treated her unfairly with respect to training, assignments, overtime and promotion.

Seelen states that she asked to operate equipment but that her requests were refused. After several requests to receive training on the blockbuster or the grader, she finally received training. However, after one month her supervisor told her she was not learning and stopped the training. That supervisor, however, had given two male employees hired after Seelen more than two months of training on the same equipment to be sure they had the training necessary for promotion.

In 1996, Seelen was injured at work and her doctor imposed work restrictions. After hearing that the restrictions were permanent, NSM sent her home. Seelen is aware of many male employees with work restrictions who were not sent home, but were accommodated with light duty jobs. She claims that she would have been qualified for a job in the control room had she been a Tech I. However, she had been consistently denied the training necessary to get promoted to Tech I.

Seelen also recalls instances where male employees would call to inquire whether overtime was necessary and then request the overtime. However, Seelen contends that whenever she called in to request overtime, she was told no overtime was available for her. She observed that when NSM needed an employee to come in for overtime, it would call the male employees, not the female employees. Seelen also observed that NSM frequently did not keep a record of when male employees refused or took overtime.

### G. Statistical Evidence

David West Peterson, Ph.D. ("Dr. Peterson"), a statistical expert, analyzed NSM's promotion, pay and overtime records from 1994 through 2000. He found that NSM's records demonstrate that in every year from 1994 through 2000, female employees were paid less than male employees ($2920 less pay) and female employees received fewer hours of overtime and less overtime pay than male employees ($821 less overtime pay). Dr. Peterson concluded that the disparity in gross pay, overtime hours and overtime pay is statistically significant and indicated that women are being discriminated against because the pattern of pay differences cannot be attributed to chance. Dr. Peterson analyzed NSM's promotion records and found that women, on average, had to wait longer than men at each tech level to be promoted. He also found that men received a statistically greater percentage of available promotions than women. After analyzing the data provided for eight departments located in Babbitt and Silver Bay, Dr. Peterson concluded that the statistical evidence confirmed company-wide gender discrimination.

NSM retained a statistical expert, Sharon Kelly, Ph.D. ("Dr. Kelly"). Dr. Kelly admitted that from 1994 through 2000 the average female employee was paid less than the average male employee, and that the disparity in pay between men and women exists compa-

ny-wide among hourly employees. Dr. Kelly also found that in six departments, women earned less gross overtime pay than men in most years over a seven-year span. Further, Dr. Kelly found that in six departments, the average number of overtime hours worked by men was greater than the average number of overtime hours worked by women in most years out of the six years studied.

## DISCUSSION

Courts should not delay a class certification decision until after a decision is reached on the merits. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 558 (8th Cir.1982); *Beckmann v. CBS, Inc.*, 192 F.R.D. 608, 612 (D.Minn. 2000). As such, courts have generally held that class certification issues should be addressed before consideration of a dispositive motion, *Beckmann*, 192 F.R.D. at 612; *Bowling v. Pfizer, Inc.*, 142 F.R.D. 302, 303 (S.D.Ohio, 1991). The Court currently has three motions before it. Because the issue of class certification relies in part on the expert testimony of Dr. Peterson, the Court will initially consider the motion to exclude his expert report. The Court will then consider Plaintiffs' motion for class certification and NSM's motion for summary judgment.

### I. Exclusion of Expert Report

The original Complaint in this matter was filed in 1999. Since then, four extensions have been granted for discovery and the filing of expert opinions. Pursuant to the amended deadline, Plaintiffs submitted their original expert disclosure on February 28, 2002. As part of that disclosure, Dr. Peterson submitted his expert report entitled "Analysis of Pay, Overtime and Technician Levels by Gender at Northshore Mining Company." At the time the report was prepared, Dr. Peterson had not completed his review of all the evidence available from NSM. NSM contends that Dr. Peterson's report does not assert that his report was interim in nature or incomplete. The report, however, notes that "[i]f we learn more about the data in our possession or receive additional data concerning training, job assignment, compensation or overtime hours, we may revise or augment our conclusions."

On April 10, 2002, NSM produced hundreds of pages of additional documents, which were used by NSM's expert, Dr. Kelly, in preparing her report and analysis. Some of this data Dr. Kelly admitted was not given to her until that date, and she had difficulty constructing her databases because of missing documents and information. Dr. Kelly testified that she intended to share her study and its conclusions with opposing counsel. Because of the delay in receiving these documents. Dr. Kelly was also unable to meet the Court's deadlines.

Dr. Peterson's deposition was taken June 24, 2002, the week before discovery closed, he suggested that his initial report was interim in nature. When NSM's counsel asked him if he was going to produce a supplemental report, he informed her that he would be doing so by August 1, 2002. He explained that in order to reach his conclusions, he had created a computer program constructed from paper records received from the Plaintiffs. He explained that from then until August 1st, he would not be reconfiguring his database, but would be adding the new data. NSM did not object at that time. When asked why he did not submit a final report on February 28, 2002, Dr. Peterson stated that "we ran out of time," and that he was missing some data. Also, when asked why he did not submit his final report in accordance with the Court's pre-trial deadline of March 1, 2002, he explained that Plaintiffs' attorneys never told him about the deadline. NSM also allege that Plaintiffs' attorney did not provide Dr. Peterson with all of the documents NSM had produced during the discovery process.

On July 31, 2002, Plaintiffs served their Motion for Class Certification and attached an affidavit from Dr. Peterson along with a new report dated July 26, 2002. The supplemental report contains similar analysis, findings and conclusions and is based on the same data as the original report in addition to the new data obtained from NSM after the original report was served. Dr. Peterson's affidavit explained that he was submitting a new report because, "he had not completed review of all of the pertinent data ... nor

completed the creation of his data base," when he wrote his first report.

The supplemental report, like the initial report, states that female employees at NSM were paid statistically significantly less than male employees each year, 1994 through 2000; that female employees worked statistically significantly less overtime than male employees from 1994 through 2000; and that female employees occupied lower technical levels in disproportionately large numbers relative to males from 1994 to 2000.

NSM argues that the late expert disclosures provided at the class certification stage are untimely and should be excluded. NSM claims that, although plaintiffs had a duty to correct any incorrect information in their expert reports under Rule 26, the rule "does not, however, bestow upon litigants unfettered freedom to rely on supplements produced after a court-imposed deadline, even if the rule's pretrial time limit is satisfied." *Reid v. Lockheed Martin Aeronautics Co.,* 205 F.R.D. 655, 662 (N.D.Ga.2001).

Parties are required to disclose the identities of expert witnesses prior to trial. Fed. R.Civ.P. 26(a)(2)(A) (2002). Rule 26(a)(2)(A) disclosure, "with respect to a witness who is retained or specially employed to provide expert testimony in the case ... [shall] be accompanied by a written report prepared and signed by the witness." Fed.R.Civ.P. 26(a)(2)(B). The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore; the data or other information considered by the witness in forming the opinions; and any exhibits to be used as a summary of or support for the opinions. *Id.* A party also has a duty to supplement disclosures, including expert reports, when additional information is made available to the party. Fed. R.Civ.P. 26(e)(1).

In the event that a party fails to comply with the expert disclosure deadlines in Rule 26, Rules 37 and 16 provide for the imposition of sanctions as a remedy. *See* Fed. R.Civ.P. 16(f) (stating "[i]f a party or party's attorney fails to obey a scheduling or pretrial order ... the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D) ... the judge shall require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees"); *see also* Fed.R.Civ.P. 37(c)(1) (stating "[a] party that without justification fails to disclose information required by Rule 26(a) ... is not, unless such fault is harmless, permitted to use as evidence at trial, at a hearing, or in a motion, of any witness or information not so disclosed").

Sanctions can sometimes serve as the functional equivalent of dismissal because they would deprive a party of expert testimony regarding a necessary element in their cause of action. *Waitek v. Dalkon Shield Claimants Trust,* 908 F.Supp. 672, 687 (N.D.Iowa 1995). Although a district court has authority to dismiss an action with prejudice for failure to comply with court orders or the Federal Rules of Civil Procedure, courts have concluded that dismissal with prejudice should be used sparingly because it is a drastic sanction. *Id.* at 687–88.

■ In determining whether to exclude evidence offered in a manner inconsistent with a pretrial order under Rule 37, the Court will follow the Eighth Circuit's four factor test. *See Neupak Inc. v. Ideal Mfg. Sales Corp.,* 168 F.Supp.2d 1012, 1016 (D.Minn.2001). Under the test, a court must evaluate: (1) the importance of the excluded material; (2) the explanation of the party for failure to comply with the disclosure rules; (3) the potential prejudice from allowing the material to be used at trial; and (4) the availability of a continuance to cure such prejudice. *Id.*

■ First, the Court concludes that Plaintiffs' expert testimony is extremely important to their claim. Class certification relies heavily on both individual testimony and statistical analysis. Further, NSM concedes that Dr. Peterson's analysis is important to the Plaintiffs' case because they rely on it to show that class certification is warranted.

Second, the Court finds that Plaintiffs' explanation for the late disclosure is reasonable. The Court notes that it appears that

NSM may have delayed in disclosing its data to the Plaintiffs. Although, the Plaintiffs certainly appear to have caused the late deadline, the fault cannot be said to be all theirs. Lastly, the *Reid* decision cited by NSM in support of its argument for exclusion of the expert report is distinguishable. In *Reid*, the court ordered that supplementation would not be allowed, the moving party was not aware that the report would be supplemented, and the expert testified in his deposition that he was not awaiting any additional information and had no plans to engage in any more analysis. *Reid*, 205 F.R.D. at 662. In complete contrast, here, the supplementation was not forbidden, NSM was on notice that supplementation would occur, and Dr. Peterson indicated in his deposition that supplementation was possible.

Third, the Court finds that NSM will not be severely prejudiced by the use of the report at trial. Importantly, the expert report in question is supplemental to Dr. Peterson's initial report and appears to contain much the same information as the original report. Further, it is based on data provided by NSM and provides conclusions very similar to those achieved by NSM's own expert.

Although NSM expresses concern that it has been unable to question Dr. Peterson regarding his findings and conclusions, the Court is not persuaded that this amounts to severe prejudice. Although NSM asserts that it only relied on Dr. Peterson's initial report in preparing its summary judgment motion, this is not the same as prejudice at trial and, as such, the Court finds that NSM is not severely prejudiced. Thus far, the parties have only concluded discovery on issues related to class certification. Therefore, NSM will have sufficient opportunity to question Dr. Peterson regarding his report before trial.

Further, Dr. Peterson indicated that he would be preparing a supplemental report. Nonetheless, NSM did not mitigate the prejudice it now claims by preparing a supplemental report, requesting a due date or seeking a court order setting a deadline, requesting a second deposition or requesting more time to obtain a supplemental report from its own expert. *See Whatley v. Merit*

*Distribution Serv.* 166 F.Supp.2d 1350, 1357 (S.D.Ala.2001)(reasoning that the fact that the defendant had reviewed the supplemental opinions and had time to bring detailed evidentiary motions to exclude the expert opinions warranted against finding the defendant was unduly prejudiced).

Fourth, as discussed above, the Court concludes that while a continuance may not be in order, NSM will have the opportunity to question Dr. Peterson regarding his report.

Accordingly, the Court denies NSM's Motion to Exclude Expert Report and Testimony.

## II. Class Certification

### Standard for Class Certification

Class actions are permitted by Rule 23 of the Federal Rules of Civil Procedure. To certify a class, the numerosity, commonality, typicality and adequate representation requirements of Rule 23(a) must be met, and the class must be within one of the three subdivisions of Rule 23(b). Fed.R.Civ.P. 23(a) and (b); *Paxton v. Union Nat. Bank*, 688 F.2d 552, 563 (8th Cir.1982). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Beckmann v. CBS, Inc.*, 192 F.R.D. 608, 613 (D.Minn.2000). Plaintiffs bear the burden of proof regarding the Rule 23 requirements. *In re Workers' Compensation*, 130 F.R.D. 99, 103 (D.Minn.1990). When conducting its Rule 23 analysis, the court accepts the substantive allegations in the plaintiff's complaint as true. *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 688 (D.Minn.1995). However, in reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can properly be resolved as a class action. *Webb v. Merck*, 206 F.R.D. 399, 403 (E.D.Pa.2002). When there is a question as to whether certification is appropriate, the court should give the benefit of the doubt to approving the class. *In re Workers' Compensation*, 130 F.R.D. at 103. The trial court has broad discretion in determining

whether a class action is appropriate. *See Beckmann*, 192 F.R.D. at 613 (*citing Bishop v. Committee on Professional Ethics*, 686 F.2d 1278, 1287 (8th Cir.1982)).

## A. The Implicit Criteria

Prior to considering the explicit Rule 23(a) requirements, the Court must determine whether the Rule 23(a) implicit criteria for class certification have been satisfied. The implicit requirements are satisfied when the plaintiffs can demonstrate that: (1) a defined class exists; and (2) the class representatives are within the class. *Jenson v. Eveleth Taconite Co.*, 139 F.R.D. 657, 659–60 (D.Minn. 1991).

To establish the implicit "defined class" requirement, the plaintiffs must present some evidence that discrimination, beyond their individual claims, has been suffered by the proposed class. *Id.* at 660. Statistical evidence supported by some anecdotal evidence is sufficient to establish class-wide discrimination. *Id.* at 660, n. 6. Based on the testimony of the named class representatives, other testimony on the record and the Plaintiffs' statistical evidence, the Court finds that the Plaintiffs have set forth evidence suggesting a defined class:

> All hourly and non-exempt females employed by Northshore Mining Company on or after April 24, 1998, who have been, are being or will be discriminated against with regard to the terms and conditions of their employment because of gender.

The Court also finds that the second implicit requirement—that the representative are within the defined class—is also met because all four of the class representatives are females who worked as hourly or non-exempt employees at NSM on or after April 24, 1998. Further, each representative has presented evidence that she was the victim of gender discrimination, each has the same interest and has suffered the same injuries regarding their employment as the members of the putative class.

## B. Rule 23(a) Requirements

### 1. Numerosity

The numerosity requirement is met when the class is "so numerous that joinder of all members is impractical." Fed.R.Civ.P. 23(a)(1); *Paxton*, 688 F.2d at 559. There is no absolute number necessary to establish the numerosity requirement and the "Eighth Circuit has not established any rigid rules regarding the necessary size of a class and the question of what constitutes impracticability depends upon the facts of each case." *Beckmann*, 192 F.R.D. at 613. In analyzing numerosity, courts look to such relevant factors as the size of the class, nature of the action, size of the individual claims, and the inconvenience of trying individual suits. *Paxton*, 688 F.2d at 559.

The Court finds that the numerosity requirement has been met. Plaintiffs have asserted that NSM's female employees since 1994 include forty-eight people. Further, the statistical evidence has identified the total number of hourly non-exempt female employees meeting the description of the putative class for the departments studied for the years 1998 through 2000 as at least twenty-eight and as high as thirty-seven annually. *See Talbott v. GC Services Ltd. Partnership*, 191 F.R.D. 99, 102 (W.D.Va.2000) (stating that where the class is twenty-five or more, joinder is usually presumed impracticable).

NSM argues that the Plaintiffs are concentrated in northeastern Minnesota, and because geographical dispersion of the members is not an issue, the Court should not certify a class of less than forty members. *See, e.g., Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 54–55 (8th Cir.1977) (indicating that geographical dispersion of the members can be an issue when certifying classes of less than forty members). NSM also asserts that the Plaintiffs have only provided support for their class allegations regarding the Mine Operations Department in the Babbitt operations. Thus, the number of women is only ten, which is not sufficiently numerous for class certification.

The Court finds, however, that the Plaintiffs have set forth sufficient evidence to suggest that NSM implements uniform, company-wide policies and, further, that gender discrimination has occurred on a company-wide level.

In particular, the statistical evidence produced by Dr. Peterson is dependent on the wage and promotion data for departments located at both the Babbitt and Silver Bay locations. Lastly, despite minimal geographic dispersion, the putative class members hail from two distinct locations and are numerous enough that joinder of all members would be impracticable. As such, the Court concludes that the numerosity requirement is met.

## 2. Commonality

■ The commonality requirement is met when "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2); *Paxton*, 688 F.2d at 561. "The rule does not require that every question of law or fact be common to every member of the class." *Id.* Relevant factors to consider for commonality include: (1) the nature of the employment practices charged; (2) the uniformity or diversity of the employer's practices; (3) the uniformity or diversity of the class membership; (4) the nature of the employer's management organization. *Morgan v. United Parcel Serv. of Am.*, 169 F.R.D. 349, 355 (E.D.Mo.1996). Importantly, in order for the commonality requirement to be met, every question of law or fact does not need to be the same for each class member. *See Paxton*, 688 F.2d at 561. Rather, "[a] sufficient nexus is established if the claims or defenses for the class and the class representation arise from the same event of pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir.1984).

Courts have held that a subjective decision making process used to discriminate is sufficient to meet both the commonality and typicality requirements of 23(a). *See Beckmann*, 192 F.R.D. 608 at 613–614 (citing *Shores v. Publix Super Markets, Inc.*, 1996 WL 407850 at *6 (M.D.Fla. Mar.12, 1996)(citing cases)). As the *Shores* court noted, the "policy of delegating hiring and promotion decisions to managers, who make those decisions on the basis of subjective criteria, is a common course of conduct. Plaintiffs' allegations that this course of conduct results in a discriminatory practice is adequate to meet the com-monality requirement of Rule 23." *Shores*, 1996 WL 407850 at *6.

Further, "[t]he commonality requirement is satisfied as long as the members of the class have allegedly been affected by a general policy of the defendant, and the general policy is the focus of the litigation." *Beckmann*, 192 F.R.D. at 614 (*citing Mayo v. Sears, Roebuck & Co.*, 148 F.R.D. 576, 580 (S.D.Ohio 1993)).

The Court concludes that while factual circumstances relating to specific training, promotion decisions and overtime assignments may vary from woman to woman, they all give rise to the common question of whether NSM inappropriately used gender as a factor in employment decisions. *See, e.g., Jenson*, 139 F.R.D. at 665 (stating commonality existed because the common question was whether the employer discriminated against women); *Paxton*, 688 F.2d at 561 (stating factual variations in the way the discriminatory conduct affects individual employees are not sufficient to deny class certification).

Further, although NSM argues that its policies and practices have significant objective aspects to them, such as promotional criteria that include training, equipment skills and safety requirements, the evidence of record suggests that subjective decision making was used to determine who qualified for the necessary skills training, safety training, and other relevant factors. In addition, it is not necessary that a defendant employ absolutely no objective criteria in its decision making process. *Webb*, 206 F.R.D. at 406–07; *see also Vuyanich v. Republic Nat'l Bank of Dallas*, 736 F.2d 160, 162 (5th Cir. 1984) (stating "[w]e have never required that a plaintiff prove the complete absence of objective criteria to establish the existence of a discriminatory policy").

Based on the foregoing, the Court concludes that Plaintiffs have provided sufficient evidence of similar, company-wide discriminatory employment practices to satisfy the commonality requirement.

## 3. Typicality

■ The typicality requirement is met when "the claims or defenses of representa-

tive parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3); *Paxton*, 688 F.2d at 561. In other words, other members of the class must have grievances similar to those of the named plaintiffs. *Paxton*, 688 F.2d at 562. Where the claims or defenses of the representatives and the members of the prospective class are based on the same legal or remedial theory, the typicality requirement is usually met. *Id.* at 561–62.

NSM argues that the typicality requirement is not met in this instance because Plaintiffs have presented a broad overview analysis of NSM, rather than demonstrating typicality between the different operating units such as between Babbitt and Silver Bay or among different departments.

The Court is satisfied, however, that Plaintiffs' claims are typical of the class. A review of the record indicates that both the affidavits of the named Plaintiffs and the affidavits of additional women indicate that other, non-plaintiff females were subjected to gender discrimination. Further, the statistical evidence suggests that disparities in overtime, promotions, and compensation exist among all women who are hourly, non-exempt NSM employees working in eight particular departments. Finally, there is no requirement that the class members be identically situated: "[t]ypicality is not defeated because of the varied promotional opportunities at issue, or the differing qualifications of the plaintiffs and class members." *Id.* at 561. As such, the typicality requirement is met.

### 4. Adequacy of Representation

■ The adequacy of representation requirement is met when "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4); *Beckmann*, 192 F.R.D. at 614. In making this determination, the Court must consider (1) whether the representatives and their attorneys are able and willing to prosecute the action competently and vigorously, and (2) whether each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge. *Beckmann*, 192 F.R.D.

at 614 (*citing In re Potash*, 159 F.R.D. at 692).

The Court is satisfied that Plaintiffs' counsel have adequate experience to maintain a class action. Plaintiffs' counsel have previously represented a group of thirty-eight former employees, and a group of nineteen employees in ERISA lawsuits. Although the plaintiffs in those instances were not class-certified, the litigation involved management concerns similar to those encountered in class action litigation. Further, Plaintiffs' counsel appear to have considerable experience representing employees and employers in employment practices litigation, including gender discrimination cases. As such, the first adequacy of representation prong is met.

Regarding the second prong, NSM argues that conflicts exist among the circumstances of the named Plaintiffs, as well as issues raised by the affidavits of other proposed class members. NSM asserts that some of the claims focus on unfair treatment due to medical restrictions and workers' compensation issues (i.e. Seelen, Thiel, and Warren), while others present more general claims of discrimination in terms and conditions of employment (i.e. Mathers). These two groups, NSM believes, are contradictory and antagonistic to each other. Further, NSM argues that a particularized inquiry into each employee's situation is necessary to determine the details surrounding each assignment or promotional event.

The Court, however, is satisfied that the representatives allege the same basic cause of action. All of the representatives allege that they were discriminated against on the basis of gender due to subjective employment decisions regarding training and job placement. Further, the Court sees no reason to believe that the class representatives' individual circumstances are such that their interests would be antagonistic to the interests of their fellow class members. Thus, the slight variables among the individual Plaintiffs are insufficient to deny class certification. Accordingly, the fourth prong of Rule 23(a) is established.

## C. Rule 23(b) Requirements

Having concluded that the Plaintiffs have satisfied the requirements of Rule 23(a), the Court now considers whether the Plaintiffs are within one of the three subdivisions of Rule 23(b). Fed.R.Civ.P. 23(a) and (b); *Paxton*, 688 F.2d at 563. Plaintiffs argue that the class fits within Rule 23(b)(2) and (3).

Rule 23(b)(2) requires that the named plaintiffs seek injunctive relief from the employer's acts "on the grounds generally applicable to the class." *Paxton*, 688 F.2d at 563 (citations omitted). Plaintiffs assert that the case may be certified under Rule 23(b)(2) because this is a civil rights case charging class-based discrimination, which is a prime example of the type of actions maintainable under Rule 23(b)(2). *See Beckmann*, 192 F.R.D. at 615. Further, the Plaintiffs seek injunctive relief against NSM on grounds applicable to and for the benefit of the entire class.

Rule 23(b)(3) is appropriate when: (1) common questions of law or fact predominate over questions affecting only individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R.Civ.P. 23(b)(3); *Beckmann*, 192 F.R.D. at 615 (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997)). Plaintiffs assert that the common question of whether NSM discriminated against its female employees predominates over questions affecting only individual members.

■ As the Plaintiffs seek injunctive relief, front pay, back pay, compensatory damages, punitive damages, and damages for past and future mental anguish and emotional distress, the Court concludes that a hybrid Rule 23(b) class is appropriate. A hybrid class action bifurcates the action in two phases. *Beckmann*, 192 F.R.D. at 615. The first phase addresses the issue of liability under the class action procedures of Rule 23(b)(2). *Id.* The second phase addresses the damages issue under the procedures established for Rule 23(b)(3) actions. *Id.* "A hybrid class consists of two stages: (1) the Court resolves the issue of liability under the procedures of Rule 23(b)(2); and (2) the issue of damages is resolved using the 'opt out' procedures established for Rule 23(b)(3) actions." *Id.* (citing *Shores*, 1996 WL 407850 at *9).

Accordingly, a hybrid class is applicable in this action.

## III. Summary Judgment

In addition to its opposition to Plaintiffs' motion to certify class, NSM filed a motion for summary judgment opposing class certification. In particular, NSM asserts:

(1.) the plaintiffs' class claims and Mathers' claims of discrimination are barred in all or in part by the statute of limitations applicable to Title VII claims; (2.) the report and testimony of Dr. David Peterson is unreliable and without probative value; (3.) Plaintiffs' failed to produce evidence of class-wide discrimination; (4.) Plaintiffs' claims require individualized inquiry, which is inappropriate for class relief; (5.) Plaintiff Holly Mathers'; individual claims are barred to the extent they are based on the same allegations and facts as the barred class claims; (6.) Plaintiffs' primary focus on monetary relief does not satisfy Rule 23(b)(2).

(Def.'s Mot. Supp. Summ. Judg. at 1–2).

The Court has already concluded that Plaintiff has met the Rule 23(a) and (b) requirements for class certification. In particular, the Court has determined that Plaintiffs' have sufficiently shown class-wide discrimination and that the class representatives' claims are sufficiently similar. Further it has found that a hybrid class action under Rule 23(b) is appropriate. As such, the Court denies NSM's motion for summary judgment as to claims 3, 4 and 6 as asserted in the Memorandum of Law in Support of Summary Judgment. The remaining claims are discussed below.

### Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.*, 980

F.2d 1217, 1219–20 (8th Cir.1992). The non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *See Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik,* 47 F.3d at 957. The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *See Enter. Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996). However, as the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designated to secure the just, speedy, and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quotation omitted). Further, summary judgment should seldom be granted in employment discrimination cases because they often depend on inferences rather than on direct evidence. *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994).

## A. Statute of Limitations

A filing with the Equal Employment Opportunity Commission ("EEOC") is a jurisdictional prerequisite to the filing of a Title VII suit in District Court. *See* 42 U.S.C. § 2000e–5(f)(1) (1998). "[T]he timely filing of an administrative charge by a named plaintiff in a class action satisfies the charge filing obligation of all members of the class." *Beckmann,* 192 F.R.D. at 616. The rule applies if: "(1) the charge relied upon was timely and not defective, and (2) the individual claims of the filing and non-filing plaintiffs arose out of similar discriminatory treatment in the same timeframe." *Id.*

### 1. 300–Day Statute of Limitations Period.

NSM argues that Mathers' Complaint violated the 300–day statute of limitations peri-od set forth in 42 U.S.C. § 2000e–5(e). Title VII employment discrimination claims "are viable only to the extent that the allegedly unlawful practices occurred within 300 days before the complainant filed a charge of discrimination with the EEOC." *See* 42 U.S.C. § 2000e–5(e). Thus, the 300–day statute of limitations period for Mathers' Complaint would be from April 24, 1998 to February 17, 1999. The "continuing violation doctrine" exempts conduct outside the 300–day statute of limitations period where the conduct is ongoing. "When an employer is accused of an ongoing practice that began prior to the statute of limitations period, the claim may nonetheless be timely under the 'continuing violation' doctrine." *Ashley v. Boyle's Famous Corned Beef Co.,* 66 F.3d 164, 167–68 (8th Cir.1995); *see, Beckmann,* 192 F.R.D. at 620 (*citing Jenson* 130 F.3d at 1303).

NSM argues that Plaintiff has not presented evidence that would suggest the discriminatory conduct alleged was part of an ongoing practice.

The Court finds that the Plaintiffs have alleged specific facts suggesting that violations occurred within the statutory period. In particular, the cause of action relates specifically to allegations of discrimination regarding job training, advancement and placement. "Claims that involve a pattern of discrimination with regard to training, opportunities for advancement and job assignments, embody the 'continuing violation' theory." *Cunningham v. The Kansas City Star Co.,* 995 F.Supp. 1010, 1017 (W.D.Mo. 1998). Where wrongful acts occur within the statutory period, they can also be used to hold an employer liable for wrongful acts occurring prior to the cutoff date. *Elliott v. Sperry Rand Corp.,* 79 F.R.D. 580, 585 (D.Minn.1978); *see also, Haugerud v. Amery Sch. Dist.,* 259 F.3d 678, 690 (7th Cir.2001)(stating that where there is a pattern or practice of discrimination, all discriminatory conduct relevant to the claim is considered timely). Accordingly, summary judgment is denied as to this claim.

### 2. Piggy-backed Claims

■ NSM argues that the Court does not have jurisdiction over Seelen, Theil, and Gun-

dy's discrimination claims and, thus, the "single filing" rule is not appropriate. NSM asserts that the Seelen, Theil, and Gundy's claims differ from Mathers' claims in that they focus on work restrictions and medical issues that were not similar in nature to issues regarding rate of promotion, training, overtime and assignments. Further, NSM argues that Theil's claims are different than Mathers' because Theil was an administrative assistant rather than a technician.

The Court finds, however, that the requirements of the single filing rule have been met. Contrary to NSM's argument, the Plaintiffs have adequately shown that the individual claims of the filing and non-filing plaintiffs arose out of similar alleged discriminatory treatment during the same timeframe. That is, the Plaintiffs all assert that they were discriminated against on the basis of their sex regarding key aspects of their employment. The parties' claims need not be factually identical to those timely filed, but instead need to be sufficient similarity as to prevent frustration of Title VII policies. *See Trbovich v. Ritz–Carlton Hotel Co.*, 920 F.Supp. 1030 (E.D.Mo.1995). As such, summary judgment is denied as to this argument as well.

**B. Statistical Evidence**

■ NSM argues that Dr. Peterson's expert report should be disregarded as without proper foundation and as unreliable. In particular, NSM asserts that Dr. Peterson failed to verify the data on which he relied in forming his statistical opinions and, as such, "common-sense skepticism" should be applied to his opinions. *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir.2000) (citations omitted). In addition, NSM argues that Dr. Peterson's analysis lacks probative value because it fails to consider alternative variables to explain the disparities he documented.

"If the basis for an expert's opinion is clearly unreliable, the District court may disregard that opinion in deciding whether a party has created a genuine issue of material fact." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir.2000) (citations omitted). However, "[m]ere conjecture or assertion on a defendant's part that some missing factor would explain the existing disparities between men and women generally cannot defeat the inference of discrimination created by a plaintiff's statistics." *Palmer v. Shultz*, 815 F.2d 84, 101 (D.C.Cir.1987).

NSM has not offered evidence indicating that the Plaintiffs' expert opinion is unreliable to the point that it precludes a genuine issue of material fact on the Plaintiffs' claim. Further, even assuming Plaintiffs' expert report lacks consideration of a particular variable, NSM has not offered evidence suggesting what those variables are or why they would be significant. Lastly, the Court notes that NSM's statistical evidence is based on data provided by NSM and that NSM's own expert produced conclusions that were very similar to those in Dr. Peterson's expert report.

Accordingly, the Court denies NSM's motion for summary judgment on the issue of class certification.

**IV. Definition of the Class**

In light of the foregoing, the Court concludes that the Plaintiffs' class should be conditionally certified as follows:

All hourly and non-exempt females employed by Northshore Mining Company on or after April 24, 1998, who have been, are being or will be discriminated against with regard to the terms and conditions of their employment because of gender.

The class is limited to discrimination on the basis of overtime, training, promotion, job assignments, compensation, and other terms and conditions of employment.

Based on the above, together with all files, records and proceedings herein, **IT IS HEREBY ORDERED** that,

1.) Plaintiff's Motion for Class Certification [Docket No. 32] is conditionally **GRANTED.**

2.) The class is conditionally certified as:

All hourly and non-exempt females employed by Northshore Mining Company on or after April 24, 1998, who have been, are being or will be discriminated against with regard to the terms and

conditions of their employment because of gender.

3.) Defendant's Motion to Exclude Expert Report and Testimony [Docket No. 47] is **DENIED.**

4.) Defendant's Motion for Summary Judgment [Docket No. 47] is **DENIED.**